## Walter Hickey v. The State.

### No. 2763.    Decided November 18, 1903.

**1.—Murder—Evidence—Acts and Declarations of Third Parties.**

Where witnesses who had never visited the place where the homicide was committed but once before, viz., on the day after it was committed, until three months thereafter, undertook to fix the place where the head of deceased lay by certain postholes of a fence which was standing at the time of the killing, but had subsequently been removed and the ground spaded up and trampled by stock; and a bullet having been found at that point which none of the witnesses describe as a bullet of the size and caliber of that used in the difficulty. Held, these matters, conversations and acts of these witnesses which led up to this investigation, being matters occurring between third parties, are inadmissible and should have been excluded.

**2.—Same.**

Before evidence in regard to a bullet alleged to have been found at the

place of the homicide could be introduced, it must be shown to have some connection with, or in some manner tend to solve some issue in the case.

**3.—Charge of Court—Limiting Right of Self-Defense in.**

Where appellant was fired on twice by deceased with a sixshooter, it would make no difference what the character or disposition of deceased was, or appellant's knowledge of such facts, his right of self-defense was complete, if same was in defense of himself from such attack, and the court should have so charged.

**4.—Evidence.**

Where the sheriff would have testified that, in his opinion, the shot-hole in appellant's hat was caused by a bullet, Held, the testimony should have been admitted.

Appeal from the District Court of Haskell. Tried before Hon. H. R. Jones.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

Appellant was charged by indictment, presented in the District Court of Haskell County, on the 29th day of May, 1903, with the murder of Tom Dixon, by shooting him with a pistol.

Under his plea of not guilty, he was tried and convicted and his punishment assessed at a life term in the penitentiary.

There were no eyewitnesses to the tragedy and the evidence of appellant is the only testimony showing what occurred between the parties at the time. This evidence is sufficiently stated in the opinion.

It is disclosed by the evidence that deceased and his wife had separated a short time prior to the killing, and at this time a division of the property was to be had. That Hickey (appellant) who had formerly lived with deceased's family and himself, had been sent for to represent the wife in the division and, in pursuance of that purpose, the two, appellant and deceased, had gone out to the lot, where the killing occurred.

Tom Dixon, son of deceased, testified in this connection: "Ma wanted to go down to town, and had West, my brother, to go and get a team so that she could go down to town and see Mr. McConnell. She wanted to see Mr. McConnell about getting her part of the property. Pa wanted to take all the property. Hickey (appellant) told her not to go. He just advised her not to go to town, and he said that he thought pa was reasonable, and that it could be settled without going into a lawsuit, and letting the lawyers get all of it; and said he would talk to pa." The meeting and subsequent trouble which culminated in the killing of deceased, was the result.

The above, together with the facts stated in the opinion, sufficiently recites the main features of the case.

*G. W. Thomasen, Oscar E. Oats, Woodward, Baker & Woodward,* and *F. L. Snodgrass,* for appellant.—Appellant says the testimony of the witnesses, Webb, Hamm, and Oscar Boon, and especially that of Webb and Hamm, was not admissible. The objections to this testimony, as urged by appellant were as follows: 1. Because the place where the dig-

ging was claimed to have been done and where the bullet was discovered was not identified as the place where the head of Tom Dixon lay after the alleged killing. 2. Because the digging for said bullet was too remote from the date of said killing, being more than one hundred days thereafter. 3. Because said testimony is hearsay and immaterial and incompetent, being the acts and declarations of third parties not in the presence of defendant and calculated to prejudice the rights of defendant before the jury.

The next question presented by exception is the charge of the court limiting appellant's right of self-defense, in this: the jury were instructed to take into consideration, and they had a right to take into consideration the character and disposition of deceased as known to defendant. This charge was not warranted by any evidence in the case, and was prejudicial, in this: so far as the evidence shows deceased may have been a man of quiet and peaceful disposition, yet if he was making an attack upon deceased with a deadly weapon, the law raises the presumption that he intended to kill him, and he had a right to act on that presumption without reference to the previous character of deceased. This charge would be proper and beneficial to defendant in that class of cases where defendant had shown deceased to be a man of violent and dangerous character and disposition: but such a charge as this would be clearly prejudicial in a case of this character, where there was no evidence on that issue before the court. Brady v. State, 65 S. W. Rep., 521.

*H. G. McConnell* and *Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was awarded a life sentence for murder in the first degree.

The record discloses that appellant was a cousin of Mrs. Dixon, wife of deceased, Tom Dixon. Trouble had been existing for some time between deceased and his wife, who were elderly people, which seemed about to eventuate in a final separation. Appellant had been living at the residence of the Dixon family for some time prior to the homicide, and advised against the separation, insisting they could and should adjust their differences, and live as husband and wife. Deceased and wife had grown children. Deceased had made remarks to the effect that there would be trouble in the family, and concluded a separation was inevitable, and had requested appellant to assist him in dividing the property. Mrs. Dixon had also made the same request. Appellant had declined to do so, but finally, on the morning of the difficulty, agreed to assist deceased in such division. After breakfast, appellant had gone to the lot or barn, and was currying his horse, when deceased, who seems to have been angry, went to the lot, armed with a pistol. After talking a while he and appellant began dividing the property, and had agreed upon a partial division while standing in the lot. Some of the

horses, which were in sight, and the subject of discussion between them, were a little distance away, and they moved to the lot fence nearer where the horses were and stopped. Under the facts, it is disclosed that appellant was in a good humor, deceased a little angry, but the anger seems not to have been directed, under the view of witnesses, at appellant, but at his family, or maybe more especially his wife. Shortly after reaching the fence, four shot were fired. Some of the witnesses testified the first two were almost simultaneous, then a slight interregnum, and two more; and, by some of the witnesses, as being so close together they could hardly detect the difference between the shots. One or two of the witnesses describe the shots differently, stating there was one shot, then a slight intermission, followed by two more shots almost together, then a slight interregnum, followed by a fourth shot.

Appellant's version of this matter was put in evidence by the State, and testified to also by himself. It is to the effect that, while standing at the fence, he heard a pistol click, followed by the remark from deceased, "By God, I will settle with you right now." Appellant was standing with his elbows on the fence, and was unaware that deecased was angry; that the click of the pistol and the remark of deceased were the first intimation he had that deceased was angry with him; that, as he turned, the deceased fired. Appellant knocked the pistol up, the ball going through the brim of his hat. The second shot went through appellant's coat in front near the bottom on the left side, setting the coat on fire. By this time appellant had secured his pistol. Deceased turned slightly to the right as appellant fired. The ball struck deceased in the neck to the left of the spinal column, ranged forward, coming out near or about the corner of his mustache, below the cheek bone. The second shot went in near the top of the left ear, clipping away a portion of it, and passing out a little back of the center of head. His coat was on fire when he reached the residence, some sixty or seventy yards from the scene of the shooting.

There were no eye witnesses. Reed, the first witness who reached the body of deceased, remained there at the request of appellant, who went to the county seat and surrendered to the officers, states that, when he reached the body, the pistol was in the right hand of deceased, and that he did not touch or move it. Prior to the homicide, the pistol used by deceased had been secreted by members of his family, in order to prevent deeceased from getting it. This seems to have been on account of the fact that deceased had made statements there would be trouble shortly in his family. The theory of the State was that appellant shot deceased in the neck, while standing up; that this shot produced death, and, after he fell, the second shot was fired, which entered the head near the top of the left ear, passing out through the back of the head, while the body of deceased was on the ground. Appellant's statement and testimony was to the effect that both shots were fired while deceased was standing, or rather, that the second shot was fired as he was falling. It was the

further theory of the State that, after deceased had fallen, appellant took the pistol from the body of deceased, and fired the two shots, one passing through the brim of his hat, powder burning it, and the second through his coat, as above stated. A son of deceased testified that he had been at the lot with appellant, and, in returning to the residence, met his father going in the direction of the lot. "I met him there in front of the dug-out, and I said I would go down to the lot with him; I thought I would go down there and see what he wanted me to do that day, and and he told me to go back to the house; I asked him what was the matter with him, and he said nothing, but insisted on my going back to the house; I believe that he said that he and Hickey had agreed to have a settlement or a division; when I met him, he seemed mad or talked like it; he went on toward the lot after I left him; I saw him and defendant after he got down there in the lot about the middle of the lot; they were standing there talking; I never saw them any more prior to the killing; * * * when the shooting first commenced I was then outside the door a step or two; I had started down to the lot; I first had search made for the pistol, and could not find it, and then started to the lot, and heard the shots; Mr. Hickey was in a good humor, and pa acted mad that morning; Mr. Hickey was representing my mother in the division of the property." We think this a sufficient statement of the case, without further detail of the testimony, to illustrate the questions reviewed.

Exception was reserved to the testimony of several witnesses who examined the ground at the point where the body of deceased was supposed to have been found when shot, and the discovery of a bullet at that point. This shows that John Webb, using a knife, dug a hole some three or four inches square, where they state the head of deceased lay when killed. While he was digging up the ground with his knife, the witness Hamm "had a sorghum stick scraping around there in the dirt." He picked up a bullet, and laid it in the hand of witness Webb. This occurred on May 24th, after the killing on the 11th of the preceding February. These witnesses had never been at the place since the homicide but once prior to this examination, and this was on the day subsequent to the killing. They sought to identify the place where the body lay by reason of the fact they had been there on the day subsequent to the killing, and, further, by the fact that some buttons were found at the place, which were left as a deposit from the burning of the bloody clothes of deceased; and the further fact that it was near some post holes, where the fence had stood at the time of the homicide—the fence having been removed or burned. The witnesses further show that quite a lot of stock had been fed in and around the place where the body lay, and had trampled up the ground as stock usually do under such circumstances. It is further shown that the supposed place where the body lay on the day following the homicide had been dug up with a spade by one Gatling.

We believe, under the circumstances, this testimony should have been excluded. Usually admission of evidence of this character is permissible, and it would go to the jury for what it was worth. It will be observed, however, that none of the witnesses undertake to describe the bullet said to have been found on May 24th, as to its size, or weight; in fact no description of it is given further than the mere statement that it was a bullet. The evidence is undisputed that both pistols used during the fatal affray were 44-caliber. No witness undertakes to show, even as remotely as venturing an opinion, that the bullet said to ·have been found at the place of the homicide corresponded to a 44-caliber. Conversations and acts occurring between the parties at the time of finding the bullet and those that led up to their going to the point of the homicide for the purpose of investigating, were also admitted and were included in the bill of exceptions. Conversations and occurrences of this character are matters occurring between third parties, and inadmissible. Lawson v. State, 17 Texas Crim. App., 293; Canada v. State, 29 Texas Crim. App., 537; Clay v. State, 40 Texas Crim. App., 556; Ballow v. State, 42 Texas Crim. Rep., 263. Before evidence in regard to the bullet alleged to have been found upon the ground could be introduced, it must· be shown to have some connection, or in some manner tend to solve some issue in the case. In other words, it must be in some way connected with or relevant to the matters at issue.

This is not within the rule announced in Walter Yancy v. State, decided at the present term. The court charged the jury: "If, from the evidence, you believe defendant killed said Tom Dixon, but further believe that, at the time of so doing, deceased had made an attack on him, which, from the manner and character of it and the relative strength of the parties, and defendant's knowledge of the character and disposition of the deceased, caused him to have a reasonable expectation and fear of death or serious bodily injury; then, acting under such reasonable expectation· or fear, defendant killed deceased," etc., you will acquit him.

Exception was reserve to this charge. This was a charge on actual danger, and ought not to have been limited with reference to the relative strength of the parties, and defendant's knowledge of the character and disposition of the deceased, etc. There was no evidence in regard to these matters. Appellant had the unquestioned right to defend against an attack made on his person in the manner indicated by his testimony. If he was fired upon twice by deceased with a six-shooter, as stated, it would make no difference what was the character or disposition of deceased, or appellant's knowledge of those facts. His right of self-defense was complete if it was in defense of himself against such an attack. The charge burdened appellant's self-defense with circumstances and facts not admitted. This was error. Brady v. State, 65 S. W. Rep., 621; Warthan v. State, 41 Texas Crim. Rep., 385, 55 S. W. Rep., 55; Bracken v. State, 29 Texas Crim. App., 362, 16 S. W. Rep., 192; Steagall

v. State, 22 Texas Crim. App., 491; Hackett v. State, 13 Texas Crim App., 400.

We are of the opinion that appellant should have been permitted to prove by the sheriff that, in his opinion, the shot-hole in the brim of his hat was caused by a bullet.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*