## WALTER HICKEY v. THE STATE.

### No. 3473.    Decided December 5, 1906.

**1.—Murder in Second Degree—Evidence—Witness.**

Upon trial for murder there was no error in permitting a State's witness to state his official position at the time he testified in the case.

**2.—Same—Leading Question—Statement of Witness—Track.**

Upon trial for murder there was no error to question the witness whether he had seen other tracks, the witness answering in the affirmative, and that said tracks looked to witness that they went in a certain direction.

**3.—Same—Evidence—Weapon Used—Cartridge-Hulls.**

Upon trial for murder there was no error in admitting testimony identifying the pistol used at the time of the homicide together with the cartridges and hulls in it.

**4.—Same—Evidence—Bullet—Declaration of Third Parties.**

Upon trial for murder there was no error in the introduction in evidence of a bullet that was taken out of the ground, where the head of the deceased was supposed to have lain, some three months after the homicide, the testimony showing that the witness who identified the bullet knew where the place was where the head of the deceased lay on the day of the homicide, and that he dug the bullet out of the ground; the same being of exactly the same size and caliber of defendant's pistol.

**5.—Same—Evidence—Cross-Examination.**

Upon trial for murder, there was no error in permitting the State on cross-examination of defendant to question him how many times he had testified in the case, for the purpose of contradicting him.

**6.—Same—Withdrawal of Immaterial Testimony.**

Where upon trial for murder testimony which was inadmissible was subse-

quently withdrawn from the jury, such testimony not being of great importance, there was no reversible error.

**7.—Same—Charge of Court—Withdrawal of Material Testimony.**

Where upon trial for murder, the prosecution offered to show that deceased's relatives were inimical to deceased, and conspired together to get rid of him; and the defense in rebuttal introduced evidence that these relatives had employed counsel to prosecute defendant for killing the deceased, etc., such evidence was material, and it was reversible error on part of the court to charge the jury not to consider such testimony. Brooks, Judge, dissenting.

**8.—Same—Charge of Court—Limiting Testimony.**

Upon trial for murder, where the State had introduced testimony with reference to statements made by defendant as original testimony, the court was not authorized to instruct the jury that they could only use it for the purpose of discrediting the testimony of defendant.

Appeal from the District Court of Throckmorton. Tried below before the Hon. H. R. Jones.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*Thomason & Thomason, L. N. Frank, W. T. Andrews, Woodward, Baker & Woodward, Snodgrass & Dibrell,* for appellant.—On question of introducing in evidence the bullet found in the ground: Lawson v. State, 17 Texas Crim. App., 292.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degre, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years.

Appellant's bill of exceptions number 1 complains that the court permitted witness T. B. Whitford to state his official position at the time he testified in this case. Witness answered that he was a justice of the peace. Appellant's sole contention is that the testimony is immaterial. It is always proper for a witness to state his official position: at least it was not improper in this case.

While this same witness was on the stand, he was asked: "Did you see any other tracks there like those you described awhile ago? A. Yes, sir; there were tracks that were near, and they went around and passed over the feet of the corpse; that is the way it looked to me." Appellant objected on the ground that this was leading, and it was improper for witness to state "how it looked to him." We do not think the question was leading; nor do we think it improper for the witness to state the direction in which the tracks appeared to be going.

After identifying the pistol used by appellant on the occasion of the killing of deceased, together with the cartridges and hulls in it, they were all introduced in evidence. Appellant objected, because immaterial, irrelevant, incompetent and prejudicial and calculated to in-

jure the rights of appellant. It is always permissible to introduce in evidence the pistol used in the killing, and the cartridges and hulls in such pistol, if any. In this case they were admissible not only to show the size, but to illustrate many phases of the evidence.

During the progress of the trial, a bullet was introduced that was taken out of the ground where the head of deceased is supposed to have lain. Appellant objected to the introduction of this bullet for the following reasons: because immaterial, irrelevant, incompetent and calculated to injure the rights of appellant; too remote from the day of the homicide to the finding of the bullet, being more than one hundred days after the homicide. And because statement, acts, conduct and declarations of third parties not made in the presence of appellant. Witness Webb in testifying about the bullet, stated that he supposed he dug a hole some two and one-half or three inches long, with a pocket knife, under the place that he identified as where the head of deceased lay on the day of the homicide, and immediately thereafter, and while digging the hole Hamm picked up the bullet and handed it to witness. The premises had been changed somewhat; the fences torn away: but the hole dug was under where deceased's head lay as above stated, as witness remembered it. This was on May 24, 1903, and the killing occurred on February 11. The bullet was battered. Witness "saw where the bullet had been imbedded in the ground, in the edge of the hole where I dug with my knife." Whitworth testified that the battered bullet found by witness Webb was a 44-caliber-bullet, and would fit either the pistol of deceased or appellant. In the opinion on the former appeal, 45 Texas Crim. Rep., 297, in reference to the introduction of the bullet, we held, that the same was too remote, because there was no identification of the bullet in any way, showing how it could be connected with this homicide. However, in this record we find that the State has introduced testimony showing that the bullet was the same size of those found in appellant's pistol; and furthermore, the witness appears to have thoroughly identified the place where deceased's head lay. While it is true that this record shows that it was something like one hundred days after the homicide before the bullet was found; cattle had run over the land and other things had been done that might destroy the identity of the spot, still these circumstances would only go to the probative force of the testimony and not to its admissibility. In this record we have the State showing that the bullet was exactly the same size and caliber of appellant's pistol, and that the bullet was found in the ground under the place where deceased's head had lain. We think that this renders the testimony admissible. There was no res inter alias acts and declarations proved in this record, as on the former appeal.

On the cross-examination of appellant, the State was permitted to ask him the following question: "You have testified in this case before? A. Yes, sir. Q. How many times? A. I think this is about four times. Q. Did you testify on the trial of this case at

Haskell, this way?"—Appellant objected on the ground that it is immaterial how many times he had testified in this case before this time, and was calculated to prejudice the jury. The objection was overruled. "Q. Have you not testified on all the trials?" Appellant objected on the same ground. Objection overruled. The questions were legitimate cross-examination of appellant. It seems that appellant on this trial testified that he did not know the distance they were standing apart just prior to the difficulty; but on the former trial he testified that he and deceased were standing about arm's length apart.

Appellant objected to the court permitting the witness Baxter Fortenberry to testify that deceased's daughter had attemped to hire witness to whip her father, deceased; and permitted said witness to testify that deceased's daughter had spoken very unkindly of her father. This testimony was subsequently excluded by the court. This testimony was not admissible, but the procedure was not such error as authorizes a reversal.

Appellant insists in his motion for new trial, that the verdict of the jury is contrary to the law and the evidence. The State's testimony shows in substance that appellant agreed to act for deceased's wife in the division of property,—deceased and his wife having agreed to separate. Appellant and deceased went to the lot, each standing at the fence, whittling thereon; when appellant shot deceased in the head, and after he was prostrate on the ground shot deceased again in the head. A bullet was found in the ground immediately under the place where deceased's head had lain, which corresponded in size with the bullets in appellant's pistol. Deceased's knife was found open, lying by the fence. Appellant's knife was not found. A pistol was found lying in deceased's hand, in such manner as to indicate it had been placed there by someone. The above are the proper and legitimate deductions from the State's testimony. It is true that appellant testified to a perfect case of self-defense, and testified to deceased having shot him through the brim of his hat, and through his coat. However, the State's evidence strongly suggests that these shots were placed there by appellant himself. We think that the jury were amply warranted in their verdict. There is no error in this record, and the judgment is affirmed.

· *Affirmed.*

### ON MOTION FOR REHEARING.

#### May 1, 1907.

HENDERSON, JUDGE.—This case was affirmed at a former term of this court, and now comes before us on motion for rehearing.

Appellant asks us to review the case on a number of propositions in which we formerly held against him. The propositions therein announced were correct. However, appellant, in his motion, raises a question which was not considered in the original opinion, but which

was saved in his motion for a new trial and argued in his brief, to wit: the charge of the court eliminating the testimony of Bill Dixon, Mrs. Tom Dixon and Joe Dixon with reference to the employment of attorneys to assist in the prosecution of the case. Said charge is, as follows: "You are instructed not to consider the testimony of the witnesses Bill Dixon, Mrs. Tom Dixon, and Joe Dixon with reference to the employment of attorneys to assist the prosecution in this case, for any purpose whatever; such testimony is withdrawn and excluded from your consideration." Motion for a new trial calls attention to this matter, and excepts on the following grounds: "Because said charge called the attention of the jury to testimony of the witness Bill Dixon which was admitted over the objection of the defendant and excepted to at the time, and reference is here made to defendant's bill of exceptions No. 8. Because said testimony of Mrs. Dixon and Joe Dixon was competent and relevant testimony." The effect of this bill of exceptions is to bring in review the nature and character of the testimony of these witnesses, especially of Joe Dixon and Mrs. Tom Dixon, wife of deceased, and incidentally the character of the case against appellant. It may be observed that there was but one eye-witness to the homicide, that is appellant himself, and his testimony makes out a case of self-defense. The State relied, for a conviction, on circumstances showing animus on the part of appellant, and suggesting motive for the crime, and circumstances contravening and antagonizing his statement as to how the homicide should have occurred. Appellant's account of the transaction is substantially to the effect that he was related to the wife of deceased, being her cousin; that he had not seen her in some seven or eight years. prior to the homicide, and that being in that country, in the vicinity of where she lived, pursuing his business of peddling organs, he stopped at the house for some week or two prior to the homicide, making that his headquarters; that while there he ascertained that deceased and his wife were at outs and wanted to separate; that he endeavored to dissuade the parties from separating, but found himself unable to do so; that on request of both deceased's wife as well as deceased, he agreed to assist them in dividing the property preparatory to a permanent separation; that on the morning of the homicide he and deceased went to the lot, some fifty or sixty yards from the house in a northeast direction, to divide some horses; that after they had agreed on the division of three or four horses deceased said he was not going to make a division, and seemed to get mad, and he heard the click of a pistol and deceased fired at him twice; one shot took effect in his hat, making a hole in it and powder burning it; the other shot appears to have struck his coat setting it afire. Appellant then succeeded in getting his pistol out, and he shot deceased twice, inflicting two mortal wounds, one striking deceased on the left side of the head, just below the ear and going through and coming out on the right side of the upper part of the skull, which he states was the first shot. The second shot, which he

says was fired immediately, took effect in deceased's neck, striking him in the back of the neck and coming out in front at the corner of his mouth.

The State's testimony, circumstantially, as it is claimed, controverting this theory of self-defense on the part of appellant, tends to show that appellant received a phone message either at Stamford or Haskell, the county seat, the latter of which was some eighteen miles from deceased's home, from deceased's wife, appellant's cousin, to come and assist in the separation between her and her husband and the division of the property; that he came and stayed at deceased's house for some week or ten days preceding the homicide; that he was to get paid for dividing the property, and that on the morning of the homicide, which was Wednesday morning, appellant went out to the lot armed, and it is also suggested that deceased's pistol, which was No. 44, the same caliber as appellant's pistol, was in his possession at the time of the homicide; that deceased went out to the lot, and he and appellant were standing by the lot fence, facing the fence, talking, deceased at the time with his knife whittling on the fence, as his knife was found close by where he was standing and in proximity to his feet after he was shot. The circumstances, as insisted on by the State, tend to show that while they were standing in that position appellant drew his pistol and shot deceased without warning through the neck. Deceased immediately fell backwards, his feet nearly touching the fence and his head extending almost at right angles from the fence in a north or northeast direction; that appellant then stepped over deceased's legs, as suggested from foot prints on the ground, walked to his head and fired a shot, which entered below his left ear and went through his skull and entered the ground, the bullet being found in the ground under deceased's head some time after the homicide. Appellant then, according to the circumstances as insisted on by the State, fired the pistol which belonged to deceased and which he had in his possession, one shot through his (appellant's) hat brim and the other through his coat, and then placed the pistol handle in deceased's hand, the butt resting in the palm.

The testimony in regard to the family difficulty, between deceased and his wife, shows that the family, consisting of Lillie, who was about 24 years old; Joe Dixon, son, about 20 years old; Minta Dixon, a daughter, about 16 years old, and West Dixon, son, about 12 or 13 years old, took sides with their mother. This is a sufficient statement of the nature of the State's case in order to discuss the question presented in appellant's assignment.

We will first notice the action of the court with regard to 'Bill Dixon's testimony, as it appears in the record. Bill Dixon was introduced by the State, and testified that he was a brother of deceased, and employed private counsel to prosecute the case, and agreed to give private counsel $500. This testimony was objected to by appellant on the ground that it was a statement of acts and conduct of

third parties not in the presence of defendant, and was immaterial, irrelevant and prejudicial to his rights. This objection was overruled and exception taken by appellant, and the witness appears to have further testified that it was understood that his deceased brother's property should help pay the attorney's fee, and being informed that deceased's wife would pay part of it, he said, if she would it would be all right, but if she wouldn't he was perfectly willing to foot the whole expense himself. Now, in the stenographer's report all this testimony is scratched over with a pen as if there had been some attempt made, either by the clerk or some one else, to eliminate it. Perhaps this was done by the clerk in response to the action of the court in instructing the jury not to consider the testimony. It would appear from the court's charge that this testimony was presumably admitted, and if his attempted obliteration can be considered as a part of the record, it would suggest that the testimony was admitted over appellant's objections, and if the court, accordingly, subsequently eliminated this testimony and ordered it stricken out, and instructed the jury not to consider it, it would appear that appellant might have no cause for complaint on this ground.

With regard to the testimony of Mrs. Tom Dixon and Joe Dixon, both of these witnesses were introduced by the defendant. Joe Dixon testified to several material facts for appellant, or so considered by him. Among other things, this witness testifies that he was at the home of the deceased on the morning of the homicide, and was out at the lot where appellant was just before it occurred; that he came to the house, which was some fifty or sixty yards south of the lot, and met his father going out to the lot; that when he met him he started back to the lot with him, and his father (deceased) told him to go on back to the house; that the tone of his voice indicated that he did not want him to be down at the lot with him; that he talked kinder like he was mad when he told him to go back to the house; that when he got to the house he asked Lillie where his gun was, by which he meant his pistol, and that in that connection he asked her what was the matter with father or something like that, that he seemed to be sorter mad, and he asked her if she knew where his gun was at; that he was uneasy, thinking his father had the gun. He further testified that about that time or shortly after he got in the house he heard four shots fired in rapid succession, and directly appellant came to the door; that about the time the shots were fired his mother fainted, and that when appellant came to the door they were working with his mother, and appellant said: "Manda, I have killed Tom, but I had to do it to save my own life." It is also shown by this witness that he did not go to his father after he was killed; he went to the lot close by where he was lying and got a horse. This witness was examined as to whether or not his mother had employed anybody to prosecute appellant, to which he replied that she had employed Mr. Stephens and Judge McConnell; that she paid McConnell $250 and Stephens $300.

On cross-examination by McConnell he was asked the following question: "In reference to the employment of attorneys in this case to prosecute the defendant, don't you know that McConnell was employed to prosecute by your father's brother, and that your mother only contributed a part of his fee? A. I know that I seen you first before anybody, and you asked me if we was going to employ anybody and I told you yes, and that we wanted you, and asked you what you would charge, and you told me $500 as well as I remember, and we paid you $250 and you told me that Bill Dixon said that he would pay the rest."

Mrs. Dixon testified that she was the wife of deceased; that on that morning, the morning of the homicide, the deceased helped her cook breakfast; that while talking with the deceased he said something about "getting shut of a bum." She denied that she had phoned to appellant to come to her house at any time prior to the homicide; that his coming was a surprise to her; that she had phoned to Joe, her son, to come; that she wanted him at home because her health was bad, and on account of domestic troubles. She also testified in regard to Joe coming into the house just before the shooting and asking where his pistol was; that he and his sister Lillie went to hunt for it. She also testified as to the part appellant took in regard to her husband and her separation and the division of their property; that he advised her to try and live with her husband, but that she told him that she couldn't do it, and that she asked him to assist in the division of the property between her and her husband. In answer to the question: "What were you all to pay Hickey to help you in the division of the property? She answered, "Nothing only whatever was right, whatever he thought was right, I would think that I wasn't to pay him any more than Mr. Dixon was"; that, as she had testified before, she was to pay him for whatever time he lost in making the division. She was also asked on cross-examination, if, on the day her husband was killed and at the time, she did not expect a killing there that morning, to which she replied that she did not. She was then asked, "As soon as you heard the pistol shots you realized some one was killed?" to which she replied, "Not killed, I just thought trouble and they was fighting, when Joe came in there and was looking for a gun and couldn't find it that kind of unnerved me, and when the first shot was fired it just unnerved me all over." She was asked the question on re-direct examination as follows: "Q. Have you employed anybody to prosecute this case. A. Yes, sir. Q. Who did you employ? A. I employed Mr. Stephens and paid Judge McConnell some; Billie Dixon spoke to me first about it, you know my mind is so bad on account of my health, I didn't think anything about that and didn't know anything about it, but I paid Judge McConnell half and Billy Dixon the other. Q. How much did you pay Judge McConnell? A. $250 ·wasn't it. .Q. Did you pay anybody else any money to prosecute in this case? A. Yes, sir. Q. What else? I paid Mr. Stephens $300."

The record shows that this testimony about the payment of attorney fees was elicited by appellant in re-examination, and no objection was made to same on the part of the State, but the court evidently, of his own motion, when he came to charge the jury, instructed them as before stated, not to consider the evidence of said witnesses with reference to employment of attorneys to prosecute the case for any purpose whatever; that such testimony was withdrawn and excluded from their consideration. Why the court did this is not further shown. Doubtless the court apprehended that this character of testimony could serve no purpose, and should not occupy a place in the record, otherwise without some motion the judge would not have taken the initiative and excluded this testimony. Unquestionably appellant regarded the evidence of these witnesses as material on his behalf, and some facts detailed by them tended to bear out appellant's theory of self-defense. Deceased's wife testifies that deceased agreed to serve in the division of the property reluctantly, and in the conversation that morning he spoke of getting rid of a bum, which suggested a reference to appellant. The witness Joe Dixon, deceased's son, also shows that his father was mad that morning and did not want him to be at the lot while the division of the property was being made by him and Hickey, and his evidence shows that when he reached the house he became alarmed at his father's attitude, and began to look to see if he had his pistol. In order to meet the effect of the testimony of these witnesses, as to circumstances favorable to appellant, besides the testimony of other witnesses, the prosecution sought to show by these, on their cross-examination, that they were at outs with husband and father, and had entered into a conspiracy with appellant to get rid of him. In order to rebut this, appellant showed by these witnesses that, so far from being actuated by malice against their father, or of having entered into a conspiracy with appellant to get rid of him, they had employed counsel to prosecute the appellant for this very murder, and were spending their money for that purpose. It occurs to us that in the attitude in which the testimony of these witnesses was presented, the evidence of their employment of counsel was an important fact to which appellant was entitled, and which the court, by its charge, had no right to deprive him of.

We also believe that the testimony of J. S. Post and J. E. Culberth to the effect that the defendant stated to them that deceased lived about three months after he was shot and the remark appellant made to them in connection therewith, was original testimony, and was properly admitted for what it was worth, and the court was not authorized to instruct the jury that they could only use it for the purpose of discrediting the testimony of appellant.

For the errors of the court herein discussed, the rehearing is granted, the affirmance heretofore rendered is set aside, and the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Brooks, Judge, dissents.