## WALTER HICKEY v. THE STATE.

### No. 275.   Decided November 30, 1910.

### Rehearing Granted June 14, 1911.

**1.—Murder—Bill of Exceptions—Evidence—Bill Prepared by Court—Bystanders.**

Where the trial court has rejected the bill of exceptions as prepared by the defendant and has prepared and filed a bill of exceptions made up by the court, the bill as prepared by the court must be considered, as defendant can not be deprived of all redress, although the court's bill may be defective, and although the defendant has not resorted to a bill by bystanders when it was almost impossible to secure such.

**2.—Same—Evidence—Declaration of Third Parties—Hearsay—Ill-Will of Witness.**

Upon trial of murder it was reversible error to admit in evidence the declaration of the wife of the deceased made to a third party, to the effect that it would be death which would not be long off, which tended to incriminate the defendant and to establish a preconceived plan by him to kill the deceased, and which declaration was made in the absence of the defendant; there being no testimony which would indicate hostility to the State of the said wife of deceased.

**3.—Same—Charge of Court—Self-Defense—Character and Disposition of Deceased.**

Where, upon trial of murder, the evidence did not raise the issue of the character or disposition of deceased, it was error to charge thereon.

**4.—Same—Evidence—Declaration of Third Parties.**

Where, upon trial of murder the witness denied knowledge that the deceased was going to be killed and that she had made such declaration, it was reversible error to cross-examine said witness as to whether she had not told a third party of such knowledge and then permit the State to place such third party on the witness stand and permit her to say that such statements were made to her by said witness, the witness not being hostile to the State, and the alleged declaration was not made in the presence or hearing of defendant.

**5.—Same—Evidence—Bullet—Loss of Weight.**

Where, upon trial of murder, the State was permitted to introduce testimony as to a certain bullet which was found at the place where deceased lay

and dug out of the ground some hundred days after the killing, and which was afterwards compared with bullets found in the pistol of the defendant and weighed and found of less weight than the bullets so found in defendant's pistol and there was no accounting for the difference in such weight. Held, that it must be shown that such bullet in passing through the body of deceased afterwards suffered a loss of weight, and the remoteness of time as to when the bullet was found is not material.

### 6.—Same—Trial Court must Follow Holdings of Appellate Court.

Trial courts must follow the holdings of the Appellate Court, or the case must necessarily be reversed.

### 7.—Same—Evidence—Ill-Will of Witness.

Upon trial of murder, where the defendant's witness, who was hostile to the State, denied that she had told a third party to whip the deceased, etc., there was no error in showing that she did make such statements to show her animus; besides the bill of exceptions was defective in being too general and indefinite.

### 8.—Same—Ill-Will of Witness.

Upon trial of murder on cross-examination of defendant's witness, who was hostile to the State, and had denied that she asked a third party to whip deceased, etc., there was no error in such cross-examination in order to show the animus of the witness.

### 9.—Same—Argument of Counsel.

Upon trial of murder, where State's counsel in his argument said that six years had elapsed since the commission of this crime, that defendant was in court a free man and walked the streets, that witnesses who testified in the case in its early stages had passed over the river, and that the former trial was a failure, and there was no charge requested to withdraw such remarks from the jury, there was no reversible error.

### 10.—Same—Charge of Court—Murder in the Second Degree.

Where the court's charge on murder in the second degree narrowed the State's case down to that state of mind of the defendant of a sudden transport of passion aroused without adequate cause, the charge was too restrictive of the rights of the State, and if error, it was in favor of defendant and under article 723, Code Criminal Procedure, was not reversible error.

### 11.—Same—Limiting Testimony—Credibility of Witness.

When it is apparent that the testimony of the impeaching witness can be used for no other purpose than that of impeachment, it is not necessary for the court to limit the purpose of the same in his charge, but defendant not being injured thereby such action of the court in limiting such testimony is not reversible error.

### 12.—Same—Charge of Court—Limiting Testimony.

Where impeaching testimony is calculated to be used by the jury for some other purpose, the court in his charge must limit such testimony to purposes of impeachment, and there was no error.

### 13.—Same—Charge of Court—Requested Charges.

Where part of a requested charge was not applicable to the facts and the other part was embraced in the court's main charge, there was no error in refusing such requested charge.

Appeal from the District Court of Wichita. Tried below before the Hon. A. H. Carrigan.

Appeal from a conviction of murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

Snodgrass & Dibrell and L. N. Frank and Woodward & Baker, for appellant.—As to admissibility of declarations of third parties: Wiley v. State, 33 Texas Crim. Rep., 406; Drake v. State, 29 Texas Crim. App., 265; Wilson v. State, 37 Texas Crim. Rep., 64; Gaines v. State, 58 Texas Crim. Rep., 631; Red v. State, 39 Texas Crim. Rep., 414; Kirk v. State, 48 Texas Crim. Rep., 624; Barbee v. State, 50 Texas Crim. Rep., 426; Vanhouser v. State, 52 Texas Crim. Rep., 572; State v. Davidson, 70 N. W. Rep., 879; Saunders v. City, etc., Ry. Co., 41 S. W. Rep., 1031; Williams v. State, 19 So. Rep., 826.

On the question of admitting in evidence battered bullet and weight of same, etc.: Hickey v. State, 45 Texas Crim. Rep., 297.

On question of court's charge on self-defense: Richards v. State, 53 Texas Crim. Rep., 400; Brady v. State, 65 S. W. Rep., 521.

C. E. Lane, Assistant Attorney-General, for the State.

LANE, Special Judge.—This case, on change of venue, was tried in the District Court of Wichita County, and appellant was convicted of murder in the second degree; penalty, twenty years confinement in the penitentiary. This is the third appeal. The first appeal will be found in the 45 Texas Crim. Rep., 297, and the second in the 51 Texas Crim. Rep., 230. In the opinion on the first appeal, we think, will be found a sufficient statement of the case. The appellant on former trial of the case, in the District Court of Throckmorton County, was found guilty of murder in the second degree, and his punishment assessed at twenty-five years confinement in the penitentiary.

1. It seems that a certain battered bullet, together with the pistols of appellant and deceased, and bullets taken from them, was introduced in evidence, and the first and second objections raised by appellant arise out of the action of the court in admitting in evidence the testimony of John L. Webb and C. C. Higgins, in reference to such battered bullet. The witness Webb testified on a former trial, and he having died, Webb's testimony was reproduced by the court stenographer. Webb testified that he saw the dead body of the deceased, Tom Dixon, lying on the ground where he was killed, and knew the place where the deceased had been lying; that about one hundred and four days after deceased had been killed he was digging (Mr. Ham, Mr. Daniels and his brother, Robert, being present at the time) in the ground with his pocket-knife at the place where the head of the deceased had been lying, and when he had dug a hole with his pocket-knife about two and one-half inches deep Mr. Ham, who was squatted down on the ground watching him dig, picked the battered bullet up and laid it in the hands of Webb; that he knows that that is the bullet that was discovered; that a bullet when fired through an object will have the appearance of this one, and sometimes a worse appearance. In this connection the State introduced C. C. Higgins, who was a district attorney, and he testified that this battered bullet was exhibited to him

by John L. Webb in the grand-jury room in Haskell County, at the
May term, 1903, of the District Court of said county, and that he took
possession of it. It appears from other testimony that the deceased,
Tom Dixon, was killed on the 11th of February, 1903; that he, Hig-
gins, had in his possession the battered bullet that Webb testified
about; that the pistol of appellant, as well as the pistol of the de-
ceased, was a 44-calibre; that about two years after the killing he
took from the pistol of appellant four cartridges and took three of the
bullets from them; that he had weighed the bullets after they were
taken from the shells; that he took a 38 and a 44 bullet from the
pistol of the deceased; that a 44 cartridge will not go in a 38, but a
38 will go in and shoot from a 44 pistol; that it is a little loose in
there. That he had weighed the battered bullet testified to by John
L. Webb; that it weighed 154 grains, and that the 38, without having
ever been discharged, weighed 188 grains, and that the 44 weighs 204
grains; that the weighing of the bullets occurred about two years after
the killing; that the back of the battered bullet is very nearly the size
of a 38; that it has the appearance of being very much scarred on the
face as if it had gone through the substance it had entered or gone
against, and it has a faint trace of the rifle or gun; that the front has
the appearance of having been melted or almost melted, and against
something in ashes or sand, and does not all appear to be there. It
appears from other testimony that deceased was shot twice; one shot
entered in his neck at the back of his head to the left of the spine,
and went through, and came out on the right side of his face at the cor-
ner of his mustache. This wound would have produced instant death.
The other wound entered the upper part of the left ear and went out
to the right and back of the center of the top of the head. This was
also a fatal wound. Appellant objected to the testimony of Webb be-
cause immaterial, irrelevant, incompetent, prejudicial, hearsay, and too
remote, and that it offered ample opportunities to designing persons
to fabricate this testimony, and were acts and declarations of third
parties not in the presence of defendant. Appellant objected to the tes-
timony of Higgins because irrelevant, incompetent, prejudicial to the
right of appellant, and hearsay; that said battered bullet, before it
could be introduced, must be in some way connected with or relevant
to the matters at issue. The court overruled all of the above objec-
tions, and appellant excepted. Although it appears from the evidence
that cattle had run over the premises where the body of deceased had
lain, and was otherwise changed, yet the witness Webb testified that
he knew the place where the head of the deceased had lain, and that he
dug up this battered bullet from this place. And although it was one
hundred and four days after the deceased was killed to the time when
Webb dug up the bullet, the objections, we think, went more to the
probative force of this testimony, rather than to its admissibility. The
testimony of Higgins goes to show that this battered bullet was of the
same size and weight of the bullets taken by him from the pistol of ap-

pellant, as well as deceased, both being 44s; and, although he weighed these bullets two years after the killing of deceased, we think these objections, like those to the testimony of Webb, goes more to the weight of the testimony than its admissibility. One of the material issues in this case was, did appellant shoot the deceased after he had fallen on the ground, and was this battered bullet at the time of the killing shot by appellant through the head of the deceased into the ground where it was subsequently found by Webb? If it was so shot at the time of the killing, it was competent and admissible. It would have been a part of the res gestae, and if not so shot, then it was inadmissible, and whether it was so shot or not, and whether it was fabricated, were questions for the jury. It is not so much the time when the bullet was first discovered that controls the competency of this evidence in regard to the bullet. It is the time when it was fired into the head of deceased by appellant (if at all) that determines that question. We do not think the court erred in overruling these objections. Hickey v. State, 51 Texas Crim. Rep., 230; Good v. State, 18 Texas Crim. App., 39.

2. The third bill of exceptions complains that the court erred in permitting the State's witness, Baxter Fortenberry, to testify over his objection as follows: That the witness lived in Haskell County, Texas, prior to the killing of Tom Dixon; that he was acquainted with his (Tom Dixon's) eldest daughter, Miss Lillie Dixon, now Mrs. Lillie Self; that at the time of the killing he was married; that he went with her before he was married; that at the time of the killing he had been married about one year. "Ques. Did you have a conversation with Miss Lillie Dixon with reference to her father at any time recently before the killing? Ans. I do not know as I did anyways recently before the killing. Ques. Well, before the killing? Ans. There had been something said about it several times. Ques. Did she ever say to you that she wanted to get you to whip him? Ans. Yes, she mentioned it several times about my whipping him when I was going with her. Ques. Did she ever call him bad names? Ans. Yes, I have heard her call him an old bearded devil, and such as that. Ques. Did you ever hear her call him a son-of-a-bitch? Ans. I do not know; I would not say positive, it has been so long. I could not keep everything down; I have heard her say first one thing and then another." This testimony was objected to by appellant for the following reasons: First, because said testimony is immaterial; second, because the same is seeking to impeach the witness, Mrs. Lillie Self; third, it is prejudicial, being acts and statements of third parties not in the presence of the defendant; fourth, the proper predicate had not been laid for the impeachment of said Mrs. Lillie Self; fifth, it is seeking to impeach her upon an immaterial matter, and prejudicial to the rights of the defendant. We hold that this bill of exceptions is defective, because it does not appear from this bill how the testimony of the witness Fortenberry was immaterial. An objection that the evidence is imma-

terial is too general and indefinite. Barfield v. State, 51 S. W. Rep., 908. Nor is the testimony of the witness Mrs. Lillie Self, the witness sought to be impeached, stated so \that this court can determine whether this testimony would impeach the testimony of Mrs. Lillie Self. Nor does it appear from the bill that appellant was not present, nor that a predicate was not laid for the impeachment of the witness Mrs. Lillie Self. This court has held that in reviewing an error set out in the bill we are confined to the bill itself. Diaz v. State, 53 S. W. Rep., 632. If there was any error in the action of the court in admitting this testimony it does not appear from this bill. (Same authority.) It is true that the bill of exceptions does state that the appellant did object to this testimony because it was immaterial, and because same was seeking to impeach the witness Mrs. Lillie Self, and that it was prejudicial, being acts and statements of third parties not in the presence of defendant, but it is also the settled rule of practice in this State that the mere statement of a ground of objection in the bill is not the certificate of the judge that the facts stated are true. Douglas v. State, 58 Texas Crim. Rep., 122, 124 S. W. Rep., 933. However, this witness was the daughter of the deceased; she was a witness for the appellant, and testified to facts and circumstances beneficial to his defense. We think that this testimony was admissible as going to show her animus toward the deceased. The animus of a witness is a pertinent and material inquiry and is not collateral testimony.

3. The fourth bill of exceptions complains that the court erred in overruling the objection of appellant, in admitting the testimony of Mrs. Mary Jones, a State's witness, as follows: "My name is Mary Jones. A few days before Tom Dixon, the deceased, was killed, I was in Haskell County, Texas, and at that time I saw Mrs. Tom Dixon, and was living in Haskell County then, and I suppose the defendant, Walter Hickey, was then up at the Tom Dixon place, as I saw him very often. Mrs. Tom Dixon stopped at my house about that time, and we had a conversation in reference to her separation from her husband, and I sought to persuade her not to separate from him. Q. Did she say anything in that conversation about Hickey? A. Well, I do not remember what all she said. Q. Did she, or not, say anything about the Hickeys staying with their friends? A. Yes, she did. Q. She said that? A. Yes, sir. Q. Did she put her hand up to her face and say: 'Oh, honey, it will be death?' A. Yes, she said, 'It is death, and that isn't long off.' The objections made by appellant to this testimony were: First, because it is impeaching the witness on an immaterial issue. Second, because it is acts and statements of these two parties not in the presence of defendant. Third, because it is seeking to impeach her upon collateral and immaterial matter, and is prejudicial to the rights of the defendant. We hold that the above bill is defective in that the testimony of Mrs. Dixon, the witness sought to be impeached, is not stated, nor does it appear from

the bill that the defendant was not present; nor does it appear that it is seeking to impeach her upon a collateral and immaterial matter and is prejudicial to the rights of the defendant. See authorities last cited. It does not appear from this bill that Mrs. Tom Dixon was the wife of the deceased. So far as the bill informs us, she may not have been the wife of the deceased, Tom Dixon. Besides, this testimony was admissible, in view of Mrs. Dixon's testimony, to show interest, bias and her hostility to the deceased and to the State.

4. The fifth bill of exceptions complains of the action of the court in permitting the State, upon cross-examination, and over the objection of appellant, to ask appellant's witness, Mrs. Amanda Dixon, the following question: "Is it not a fact that you knew that your husband was going to be killed?" to which question she answered, "No." This is urged as error. It does not appear from the bill that Mrs. Amanda Dixon was the wife of deceased. We do not see how the asking of this question and her answering in the negative could have been so prejudicial to the rights of appellant as to require a reversal of the case. Warthan v. State, 41 Texas Crim. Rep., 385, 55 S. W. Rep., 55. But questions of this kind should not be asked. Drake v. State, 29 Texas Crim. App., 265.

5. The sixth bill of exceptions of appellant complains of the action of the court in permitting the State, upon cross-examination of appellant's witness Mrs. Lillie Self (nee Miss Lillie Dixon), and over the objections of appellant, to ask the following questions and elicit the following answers: "Q. Is it not a fact that you tried to get Baxter Fortenberry to whip your father? A. No. Q. And is it not a further fact that you called your father an old devil and red-headed son-of-a-bitch? A. No." As before stated, this witness was the daughter of the deceased, and had testified to facts beneficial to appellant, and this appears to us as legitimate cross-examination by the State for the purpose of showing an unfriendly feeling, if any, of the witness toward the deceased, who was her father. Suppose this witness had answered "yes" to the above questions. It would have shown her feeling toward her father, the deceased. However, she answered "no," and if error (which we do not hold), it is not sufficient to require this case to be reversed. Warthan v. State, 41 Texas Crim. Rep., 385, 55 S. W. Rep., 55.

6. The seventh bill of exceptions complains of the language of the district attorney in his argument. The language is as follows: "Six years have elapsed since the commission of this crime, and the defendant is in this courtroom a free man and walks your streets a free man. The record shows that witnesses who testified in this case in its early stages have passed over the river. The records do not disclose the result of the former trials, but whatever they were, they were failures." This bill states that the defendant excepted to this language and his exception was overruled by the court, and the district attorney permitted to use said language, and the court refused to instruct the

jury not to disregard the same; but the court qualified the bill by stating that no charge was asked or refused. The record shows that six years have elapsed since the homicide, and that at least one of the witnesses who testified in the case in its early stages had died, and that there had been former trials. The only thing stated by the district attorney that appears to be outside of the record is the statement that "defendant is in this courtroom a free man and walks your streets a free man," and that the former trials were "failures." We do not believe the use of the above language by the district attorney is such a violation of the right of argument as to cause a reversal of this case. However, it will be seen from the qualification of the bill by the judge that no charge was asked or refused. This being the case, this court has held that the proper practice would require that a written charge should be asked and refused before this court would make the illegitimate argument the basis of a reversal, and before this court would interfere it must be shown that there was a very gross violation of the right of legitimate argument, and that such violation was calculated to injure or impair appellant's rights. Warthan v. State, 41 Texas Crim. Rep., 385, 55 S. W. Rep., 55.

7. Appellant complains in the eighth ground of his motion for new trial of that part of the charge of the court as follows: "Now, if you believe from the evidence beyond a reasonable doubt that the defendant, Walter Hickey, in the county of Haskell and State of Texas, did on or about the time alleged in the indictment, with a deadly weapon, or instrument reasonably calculated or likely to produce death by the mode or manner of its use, in a sudden transport of passion aroused without adequate cause, as the same will hereinafter be explained to you, and not in defense of himself against an unlawful attack producing a reasonable fear or expectation of death or serious bodily injury, with intent to kill, did unlawfully shoot Tom Dixon with a pistol, and did thereby kill Tom Dixon, as charged in the indictment, you will find him guilty of murder in the second degree, and assess his punishment at imprisonment in the penitentiary for any term of years not less than five." The complaint to this charge, as we understand it, is that there is no evidence showing that appellant, in a sudden transport of passion, aroused without adequate cause, killed the deceased. This charge certainly would have been correct if there had been evidence going to show that appellant shot deceased in a sudden transport of passion, without adequate cause. Clark v. State, 56 Texas Crim. Rep., 293, 120 S. W. Rep., 180. The evidence on the part of the State did show an unlawful killing of deceased by appellant. Then if there was no evidence showing that appellant killed deceased in a sudden transport of passion, without adequate cause, it can also be said that there is no evidence showing that appellant killed deceased under the immediate influence of sudden passion arising from an adequate cause. The court instructed the jury correctly upon the law of manslaughter. The defendant plead self-defense, but the jury found

against him upon this plea. The defendant has heretofore been convicted of murder in the second degree, which was an acquittal of murder in the first degree. Then this case presents itself in this way: The jury, under the instructions of the court, might have found appellant guilty of manslaughter, but did not do so. The appellant plead self-defense, and explained in detail the killing, which explanation showed a complete case of self-defense, but the jury did not accept his statement as to how he killed deceased; then if there was no manslaughter and no self-defense in the case, there being no eyewitness but appellant, we have a case in which deceased was killed by appellant, and, as far is the State is concerned, such killing is unexplained. Then, if appellant unlawfully killed the deceased, and there was no circumstance in evidence which tended to mitigate, excuse or justify the act, then the law implies malice, and the offense is murder in the second degree. In the case of Connell v. State, 81 S. W. Rep., 748, which was a case in which the appellant had been convicted of murder in the second degree and the case had been reversed, this court on the second appeal said: "Here the jury were instructed that malice 'aforethought,' as applied to murder in the second degree, includes all those states of the mind under which the killing of a person takes place without any cause which will in law justify, excuse or extenuate the homicide." Then if murder in the second degree includes all of those states of the mind under which the killing of a person takes place without any cause which will in law justify, excuse or extenuate the homicide, then it follows that when the court narrowed the State's case down to that state of mind of a sudden transport of passion, aroused without adequate cause, such charge was too restrictive of the rights of the State, and if error, it was in favor of appellant, and under article 723 of the Code of Criminal Procedure we can not, on account of such error, reverse this case.

8. Appellant complains of the charge on self-defense, which is as follows: "If from the evidence you believe the defendant killed the said Tom Dixon, but further believe at the time of so doing the deceased had made an attack on him which, from the manner and character of it, and the defendant's knowledge of the character and disposition of deceased, caused him to have a reasonable expectation or fear of death or serious bodily injury," etc. The complaint raised to this charge is that there is no evidence of the defendant's knowledge of the character and disposition of the deceased. The evidence in this case showed that appellant had known deceased all of his life, except that he had not seen him for eight years previous to this visit to the home of deceased; that he had stayed, on this visit, at the home of the deseased for about two weeks before the killing; that appellant and deceased during this two weeks were together pretty regularly, unless it was when appellant was on the road with an organ. In this there was no error.

9. Complaint is also made to the charge of the court wherein the

court charged the jury as follows: "You are instructed that you can not and must not consider the testimony of the witness Fortenberry as to what he testified, as to that which the witness, Lillie Self, stated to him in regard to her father, Tom Dixon, deceased, as any evidence against the defendant, but may be considered by you only insofar as it may affect the credibility of Mrs. Lillie Self's testimony, if in your opinion it does do so." Appellant objects to this charge because the same is upon the weight of the testimony; that it instructs the jury to consider said testimony upon the credibility of the witness Mrs. Self; that it assumes that the witness Mrs. Lillie Self made the statement to Baxter Fortenberry. Mrs. Lillie Self was a witness for the defendant, and testified to facts beneficial to his defense. This witness on cross-examination testified that she was not mad with her father. "I never tried to get Baxter Fortenberry to whip my father. It is not a fact that prior to that time, on one occasion when Baxter Fortenberry was there, I spoke vilely of my father, called him an old son-of-a-bitch, and wanted to get him to whip him. I never at any time abused my father or said anything unkind of him." Baxter Fortenberry testified for the State that he knew Miss Lillie Dixon (now Mrs. Lillie Self): "She had mentioned several times about my whipping her father when I was going with her; I have heard her call him an old bearded devil, and such as that; I would not be positive about her calling him an old son-of-a-bitch; I have heard her say first one thing and then another." It will be perceived from the above statement that the witness Mrs. Lillie Self did not state any fact incriminating the appellant. It is simply a case in which the State introduced evidence for the purpose of impeaching appellant's witness without proof that the witness sought to be impeached had made statements incriminative of appellant. This court has held that when it is apparent that the testimony of the impeaching witness can be used for no other purpose than that of impeachment, it is not necessary for the court to limit the purpose of the same in its charge. Wilson v. State, 37 Texas Crim. Rep., 373, 39 S. W. Rep., 373. Although the court did restrict the testimony of the witness Fortenberry to the impeachment of the witness Mrs. Lillie Self, under the above authority the court was not compelled to do so, and yet, as the testimony of Fortenberry could have been used by the jury for no other purpose than impeachment, we do not see how appellant was injured by such action of the court in so restricting the testimony of said Fortenberry.

10. Appellant also complains of the following portion of the court's charge: "You are instructed that you can not and must not consider the testimony of the witness Mary Jones as to what she testified to, what Mrs. Tom Dixon said to her, as any evidence against the defendant, but may be considered by you only insofar as it may affect the credibility of Mrs. Tom Dixon, if, in your opinion, it does so." Appellant excepted to said charge because it instructs the jury to con-

sider said testimony upon the credibility of the witness Mrs. Jones, and because it assumes that the witness Mary Jones made the statement to Mrs. Tom Dixon as testified to. Mrs. Tom Dixon, witness for appellant and wife of deceased, on cross-examination testified as follows: "I know Mary Jones; she lived over west about a mile at that time, I think. I had passed her house a few days before this (the killing). I was on my way up to the store, and was passing, and stopped. I do not remember that I was in the house and stayed there; it is not a fact that we said anything about my division of any property; I talked with her about the separation. I do not remember her trying to persuade me not to separate from my husband; she knew that Walter Hickey was there without my telling; I do not remember of talking to her about it. Q. And didn't you in that connection with Walter Hickey's name put your face in your hands and say: 'Oh, honey, it is going to be death.' A. I never said such a thing at all, I know. I never said anything about Mr. Dixon's death, I know, because I did not know anything about it." The witness for the State, Mary Jones, contradicted the above testimony of Mrs. Tom Dixon. The court did not err in giving the above charge restricting the testimony of the witness Mary Jones to the impeachment of Mrs. Tom Dixon. Where evidence for the purpose of impeaching a witness is introduced, which is calculated to be unduly used by the jury for some other purpose than as impeaching testimony, then the court in his charge must limit such testimony to the purpose for which it was introduced. Wilson v. State, 37 Texas Crim. Rep., 373, 39 S. W. Rep., 373. We do not think that the court committed error in this portion of its charge.

11. Appellant complains at the action of the court in refusing to give at his request the following instruction: "You are charged that if you believe from the evidence beyond a reasonable doubt that the defendant is guilty of murder in the first degree (as murder in the first degree has heretofore in the court's general charge been defined to you), and you further believe that the facts and circumstances in evidence do not show that the defendant is guilty of murder in the second degree (as murder in the second degree is defined in the court's general charge), and if you so believe you will find the defendant not guilty, and so say by your verdict." On the authority of the case of Burnett v. State, 53 Texas Crim. Rep., 515, 112 S. W. Rep., 74, and Cornelius v. State, 54 Texas Crim. Rep., 173, 112 S. W. Rep., 1050, we hold that the court did not err in refusing the first portion of said charge, and so far as the second part of said charge is concerned, the court had already instructed the jury that if they had a reasonable doubt that appellant was guilty of murder in the second degree they would acquit him.

12. Appellant complains at the action of the court in overruling his motion for new trial because, he says, the verdict of the jury is contrary to the law and the evidence. It appears from the record in this case that appellant has been tried five times, in three, at least, of

which a conviction of appellant resulted. In one appellant was convicted of murder in the first degree and in two he was convicted of murder in the second degree. There were two theories presented at the trial. That of the State was that appellant was guilty, at least, of murder in the second degree. The theory of appellant was self-defense. The jury accepted the theory of the State and convicted appellant of murder in the second degree, which, to our minds, there was evidence to support the verdict of the jury, and we therefore can not interfere with their action. The judgment is, therefore, in all things affirmed.

*Affirmed.*

Davidson, Presiding Judge, dissents.

### ON REHEARING.

#### June 14, 1911.

HARPER, JUDGE.—At a former day of this term this case was affirmed, and has been pending some months on a motion for rehearing. As two of the present members of the court did not hear the original presentation of the case, upon invitation, we heard argument on the motion for a rehearing. Inasmuch as the opinion was rendered by one who is not now a member of the court, and not agreeing to all the holdings in the opinion, we have given the record more than usual study, but being unable to give our assent to the opinion, especially to the holding in the third paragraph, we think it best to give our reasons thereupon. In the first place, the record shows that the court refused appellant's bill complaining of the admissibility of this testimony, the bill in the record containing the following clause: "The defendant presented to the court his bill of exceptions No. 4 and the court refused same. The court, therefore, makes up and files this bill of exception in lieu of defendant's bill of exceptions No. 4 and orders the same filed and made a part of the record herein. This bill relates to the admissibility of the testimony of Mrs. Mary Jones, who testified that Mrs. Dixon, a few days before the deceased was killed, had said to her that the "Hickeys stayed with their friends," and said, "Oh, honey, it will be death—it is death, and that not long off."

In the original opinion the court holds that the "bill is defective, in that the testimony of Mrs. Dixon, the witness sought to be impeached is not stated, nor does it appear from the bill, that the defendant was not present."

We will not discuss as to whether the bill is defective in the particulars mentioned. It appears from the bill itself that the bill made out by defendant and presented to the court was rejected. This bill, by the action of the judge, we are not permitted to see, and know whether or not it was defective in the particulars named or any other particular. Article 724 of the Code of Criminal Procedure provides:

"On the trial of any criminal action the defendant, by himself or counsel, may tender his bill of exceptions to any decision, opinion,

order or charge of the court, or other proceedings in the case, and the judge shall sign such bill of exceptions under the rules prescribed in civil suits, in order that such decision, opinion, order or charge may be revised upon appeal."

In regard to the rejection or modification of bills, we find the following provisions in the Revised Civil Statutes: "Art. 1367. Should the judge find such bill of exceptions to be incorrect, he shall suggest to the party or his counsel, who drew it, such corrections as he may deem necessary therein, and if they are agreed to he shall make such corrections and sign the same and file it as provided in the preceding article.

"Art. 1368. Should the party not agree to such corrections, the judge shall return the bill of exceptions to him with his refusal indorsed thereon, and shall make out and sign and file with the clerk such a bill of exceptions as will in his opinion present the ruling of the court in that behalf as it actually occurred."

It is true that other articles of the statute provide, if appellant is dissatisfied with the bill, he may prove up a bill by bystanders, yet we do not think a bill should be stricken from the record when prepared by the court because of some defect. As in this case, which was tried on June 30th and the bill not prepared by the court until August 20th, it would be almost impossible to secure a bystanders' bill at that late hour. We are all aware that trial courts do not generally permit attorneys to delay the proceedings by preparing their bills at the time the exception is taken, but notations are made, and they are generally prepared after the trial of the case is finished, and under such conditions, when the bill prepared by defendant's counsel is rejected, and the court prepares and files a bill in lieu thereof, about which defendant nor his counsel are consulted, we will not reject because of some defect of form, but in such case we will take the bill as prepared by the court, and decide whether or not any error has been committed in the matters therein recited. We can not conceive the justice of the trial court rejecting the bill as prepared by the defendant's counsel, and then we reject the bill as prepared by the court, thus depriving a defendant of all redress, no matter how grievous or hurtful the error may have been, but think the correct rule should be that, where the trial court has rejected the bill as prepared by a defendant, and prepared and had filed a bill, we should review the matter as presented by the bill prepared by the court. This will bring in review whether or not statements of the character alleged, made when the defendant was not present, are admissible as against defendant, for the recitations in the bill as prepared by the court shows the witness says: "I suppose the defendant (Hickey) was then up at Tom Dixon's place, as I saw him there very often. Mrs. Dixon stopped at my house and we had a conversation." And then it is she says the remarks were made about the Hickeys staying with their friends, and "Oh, honey, it will be death—it is death that is not long off." In

·holding that the bill should be considered, there is a statement in the opinion that we do not think the evidence justifies. "Besides, this testimony was admissible in view of Mrs. Dixon's testimony, to show interest, bias and her hostility to the deceased and to the State." The evidence of Mrs. Dixon is as follows:

"I have been sworn as a witness; I live in Brewster County now; I came from there here; I am the wife of Tom Dixon, deceased; I am fifty-two years old; Mr. Dixon and I lived together twenty-seven years before his·death; I had six children by Mr. Dixon; four are living and two are dead. I know the defendant, Walter Hickey; I have known him ever since he was a little boy; we are first cousins. I remember the circumstance of my husband being killed at our house on the 11th of February, 1903. The defendant was at my house at that time. I think that he had been there about two weeks; I can not remember just when he came—some eight or ten days or two weeks; he came from Dublin or Stephenville—somewhere down there—to our house. It had been seven or eight years, as well as I can remember, since I had seen him until he came there that time; I had not thought about that in so long. He was engaged in the organ business. It was after breakfast that the killing occurred. My husband helped me to cook breakfast that morning, and we cooked some; we talked some while we were cooking breakfast. Prior to the time of the killing my husband and I had decided not to live together. It must have been six weeks or two months before Walter Hickey came to our house that we had decided not to live together. Walter Hickey did not know anything about mine and my husband's trouble before he came there. I talked to him about my trouble with my husband after he came there. I told him that me and Mr. Dixon had decided to separate and not live together; he seemed astonished about that, which of course he was, and he asked me if it could not be fixed up and we live together again, and I told him no, that I did not think that we could; he said that he thought that the best thing for me and Mr. Dixon to do would be to live together. He never did say a thing on earth to me—nothing that I know of—to try to get us not to live together; he said that he did not want to help to divide the property, that he would rather not have anything to do with it. I had talked to him and Mr. Dixon had talked to him, too, before this, about helping us to divide the property, and he said that he would rather somebody else would; he didn't want to have anything to do with it; he finally agreed, however, to divide the personal property between me and my husband, if Mr. Dixon was willing; I didn't want him to help without everybody could be agreeable. It was agreeable with Mr. Dixon as far as I knew. The reason that me and my husband could not live together, he just took spells, got mad and cross and stormed so; my health just kept getting worse, and he would just get mad about just nothing nearly, and my health just gave way so that it just seemed like I couldn't stand it, when he would come in and begin to cursing, and I just wanted to go off

somewhere and have peace.  He was generally sober when he would
have these cursing spells.  He hádn't drunk any in a long time until
we went out on that prairie; never did drink any after my little boy died
until we went out there, and then he would just drink a little at the
start, and he nearly always was in a good humor while he was drink-
ing right then, and it was generally the next day or in a day or two
when he would be mad.  He would just curse; he just stormed the
gospel; he cursed and raged; I just got so weak that it seemed like I
couldn't live; I just wanted to go away where everything could be
quiet; I was in mighty bad health then; I was awful weak and nerv-
ous.  The morning of the killing he helped me to get breakfast; all
of the conversation that I remember of having with him was, I remem-
ber of hearing the children singing, and it sounded so pretty, I said:
'Just listen; isn't that awful pretty?' and he said, 'Yes, it just suits
you.'  That was the first that I knew that he was't in good humor,
and I said, 'Yes, it is awful pretty; don't you love to hear it?' and
then I don't know as he said anything more about the music, but after
a little bit he said, 'I am shed of one bum, and I am going to get
shed of another one.'  I said, 'What do you mean, who are you mad
at, anyhow?  What is the matter?  Are you mad about Walter Hickey
staying here?'  I thought that he had reference to him, and he said:
'Walter is all right,' and that is all that I remember about it.  Leonard
Reid had been staying there; he had stayed there right smart; I reckon
that Walter Hickey was in the house or out in the lot while this con-
versation was going on; I do not know whether he was helping or up
here in bed.  It was early in the morning, but Menta and Joe and
Lillie were singing; the organ was probably new and Menta played the
organ."

In this there is nothing that manifests bias, interest or hostility to
the State.  Of course, it shows disagreement between her and her hus-
band, and they had decided to separate, but in no part of the record
is it suggested that defendant was the cause of the separation, and
when it further appears in the record that she had contributed $550
to employ two able attorneys to prosecute appellant for killing her hus-
band, we do not think such bias or prejudice is shown in favor of de-
fendant as to render admissible these very damaging statements.  No
one saw the killing except defendant; he testified to a case of self-
defense.  The State relied on circumstances to show his statement was
not true, and that the homicide was an unprovoked murder.  In the
testimony, this matter Mrs. Jones testifies to is all the evidence which
shows or tends to show that the homicide was a preconceived killing,
and it falls from the lips of one who is employing attorneys to prose-
cute appellant, at a time when he is not present, and he should not be
bound nor prejudiced thereby.  This good woman is in an unenviable
position.  Her first cousin is being prosecuted for killing her husband.
According to the theory of both State and defendant, the killing took
place when appellant was trying to render her a service in the division

of the property. If she was willing to be untruthful to aid him, she fails at the critical moment, for when she says that deceased remarked he had "got rid of one bum and was going to get rid of another," she says he had no reference to defendant, but remarked, "Walter (meaning defendant) is all right," and in no instance does she testify to words, acts or conduct showing hostility of deceased toward defendant, or any fact that would justify defendant in taking the life of deceased. It would have been of material aid to defendant if he could have shown these words of deceased had reference to him. So far as we have been able to find, there is an unbroken line of decisions which hold that declarations and opinions of third parties, in the absence of a defendant, which tend, as does this, to incriminate and to establish a preconceived plan to kill another, are inadmissible. In the former opinion in this case, 51 Texas Crim. Rep., 230, Judge Brooks, in rendering the opinion, holds that the testimony of Baxter Fortenberry was inadmissible, saying: "Appellant objected to the court permitting the witness Fortenberry to testify that deceased's daughter had attempted to hire witness to whip her father, deceased, and had permitted said witness to testify that deceased's daughter had spoken very unkindly of her father. This testimony was not admissible." Yet, in the face of that decision, in this case the court not only admits the testimony of Fortenberry, but the far more damaging testimony of Mrs. Jones, which in the case of Drake v. The State, 29 Texas Crim. App., 265, is expressly held to be inadmissible, and which question is treated at length in that decision, and which has since been followed by this court. We do not wish to be understood as holding that if a witness by her testimony shows bias, prejudice or hostility to the State, and testifies to facts in a case in behalf of either the State or defendant, that on cross-examination such witness can not be asked if she did not make statements at variance with her testimony, and such facts shown, if the witness had done so, but where the witness in her testimony, as in this case, does not indicate prejudice or hostility to the State, she can not be cross-examined on a matter about which she has not testified, and then contradicted, in order to get before the jury an opinion of a third person as a circumstance upon which a theory can be built up to show a preconceived killing. This testimony should not have been admitted.

Again, the charge in this case, in presenting self-defense, was condemned in the former appeal (45 Texas Crim. Rep., 297). In the case of Richards v. The State, 53 Texas Crim. Rep., 400, Judge Ramsey, speaking for the court in regard to a similar charge, holds: "Again, we think there was error in the thirty-first paragraph of the court's charge. This portion of the charge is as follows: 'You are further instructed that if you believe from the evidence in this case, viewing it from the standpoint of the defendant at the time, that immediately before the killing of the said W. T. McCall by defendant the said McCall had made a demonstration as if to draw a weapon,

and from the manner and character of said demonstration (if any) and the defendant's knowledge of the *character* and *disposition* of the deceased defendant was caused to have a reasonable expectation or fear of death or serious bodily injury, and that defendant, acting under such reasonable expectation or fear, and while such reasonable expectation or fear continued, shot and killed the deceased, or if you have a reasonable doubt as to said facts, then you will acquit the defendant, although you may believe from the evidence that the deceased in fact had no weapon at such time, and that the defendant was in truth in no danger from an attack by deceased.' The vice of this charge is the inclusion in the paragraph copied of these words: 'Knowledge of the character and disposition of the deceased.' There was no evidence of what his character and disposition were, and little, if any, evidence of appellant's knowledge of same, at least within recent years. Almost this identical charge was condemned by this court in the case of Hickey v. State, 45 Texas Crim. Rep., 297."

As said in that case, in this case the evidence in no instance speaks of the "character or disposition of the deceased," and it is only where the evidence raises this issue should it be included in the charge.

As a general rule there would be no reversible error in permitting a witness to be asked "if the witness did not know that the deceased was going to be killed," where the witness answers, "no," but in this case the harmful effect of such question can be conceived, when one takes into consideration the questions asked in regard to what she is charged with having told Mrs. Jones, which was denied, and then permitting Mrs. Jones to take the witness stand and testify that such statements were made. If the jury believed Mrs. Jones, they would give but little credence to her denial of the other fact.

Appellant in his motion also complains of the ruling of the court in regard to the testimony of the witnesses Higgins and Webb as presented in the original opinion. In the first appeal in this case, this testimony was held inadmissible on the ground that there was no proof that that bullet was of a size to have been used in either pistol. In the second appeal it was held admissible on the ground that the witness Whitworth testified that the bullet found by Webb was a 44-caliber bullet. There is no such testimony in the record on this appeal. Whitworth did not testify. In fact, a 44-caliber bullet is shown to weigh 207 grains, while the bullet found weighed only 154 grains, and there is no accounting for the difference in weight. If the testimony on another trial should develop that a bullet in passing through the ear and head would lose this much weight, under the holding of this court in Hickey v. State, 51 Texas Crim. Rep., 230, this testimony may be admitted, even though it was remote in time. But we would suggest that if the evidence does not meet the requirements announced in the opinions in two former appeals in this case, this testimony should not be admitted by the court.

This is the third appeal in this case, but if the trial courts do not

follow the holdings of this court on appeal in a second trial of a case, it will necessarily be reversed. The charge of the court is in direct conflict with the opinion in this case reported in 45 Texas Crim. Rep., 297; in admitting the testimony of Fortenberry and Mrs. Jones, the action was in direct conflict with the opinion of this court in 51 Texas Crim. Rep., 230, and we trust upon another trial of this case the same questions will not be again presented to us. On all questions not herein discussed we adopt the holdings of the original opinion.

Appellant's motion for rehearing is granted, the judgment is reversed and the cause remanded.

*Reversed and remanded.*