## JOHN MESSER V. THE STATE.

### No. 2148.　Decided May 29, 1901.

**1.—Wife as Witness—Impeachment of.**

Where the wife is a witness on the trial of her husband, she may be impeached by showing her contradictory statements to her testimony given on the trial; but witnesses can not be permitted further to prove her statements as to other independent matters about which she has not testified.

**2.—Same—Charge of Court.**

Where the wife has testified on the trial of her husband, and evidence tending to contradict her has been adduced, a charge of the court is not on the weight of evidence which instructs the jury that the testimony of the witnesses as to her contradictory statements was introduced solely as going to her credibility as a witness, and should be considered only for that purpose and not as evidence of defendant's guilt.

**3.—Murder—Insulting Conduct to Wife—Manslaughter—Charge.**

On a trial for murder, where insulting conduct towards the wife has been adduced for the purpose of reducing the offence to manslaughter, the jury are to consider the statements of the wife to the husband about such insults, which he believed to be true and to have actually occurred as detailed by her; though in fact they may or may not have occurred. To his mind such conduct was a reality and the charge of the court should be so framed as to submit this immediate issue to the jury.

**4.—Same.**

As to insults to the wife, the jury are to consider them from the standpoint of the defendant, and whether he believed them as told him by his wife, and though the jury may believe her statements as to such insults are not true, yet they are to consider them in connection with the statements and acts of the deceased at the time of the homicide; and if from such insults and acts of deceased at the time of the homicide defendant slew deceased in uncontrollable passion, he would be guilty of manslaughter and not murder; and the court should so instruct the jury. Simply because the deceased, at the time of the homicide, may have offered an insult to defendant, sufficient to create adequate cause independent of the previous insults to his wife, would not warrant the court to ignore such previous insults in charging upon manslaughter, but a fortiori the present adequate cause should be considered with such previous insults.

**5.—Murder—Self-Defense—Defendant's Knowledge of Deceased's Character—Charge.**

On a trial for murder, a charge of the court is correct, and not upon the weight of evidence, which instructs the jury, that "if they believed from the evidence that, at the time defendant killed deceased, deceased made an attack upon him, which, from the manner and character of it, and the relative strength

of the parties, and defendant's knowledge of the character and disposition of the deceased, caused him to have reasonable expectation or fear of death, * * * then you will acquit."

**6.—Same—Evidence—Corroboration of Wife's Testimony.**

On a trial for murder, where defendant's wife had testified to insulting conduct by deceased toward her, it was competent, as corroborative of her testimony, to prove that about the time she testified that deceased began his insulting conduct he asked a witness "how he liked his little widow?" referring to defendant's wife before her marriage to defendant, and on being reprimanded by witness, replied that witness "knew his weakness along that line."

**7.—Impeachment of Wife as a Witness—Rebutting Testimony.**

Where the wife, on the trial of her husband for murder, testified as to insults by deceased which she and defendant both testified she had communicated to defendant, and the State had attacked her testimony as false and fabricated, it was competent, in rebuttal, to prove by a witness, that prior to the homicide the defendant (the husband) had related to witness the circumstances as previously told him by his wife. This testimony was admissible to corroborate and strengthen the testimony of both the husband and wife as to this matter and to rebut the contention of the State that the defense was fabricated.

Appeal from the District Court of Bell. Tried below before Hon. John M. Furman.

Appeal from a conviction of murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

Appellant was charged by the indictment with the murder of J. D. Boyd, on the 2d day of October, 1900, by shooting him with a pistol. The statement of facts is most voluminous. It is substantially condensed in the following statement, taken from the brief of appellant's counsel, viz:

The killing occurred within the limits of the city of Belton, in Bell County, on the morning of October 2, 1900, between 10 and 11 o'clock. The deceased was a Missionary Baptist preacher who had lived in Belton since December, 1899. Defendant was 38 years old, was born and raised in Bell County, and for several years prior to the homicide had resided in Belton. On March 19, 1900, he was married to his wife, who prior to such marriage was a widow, with two small children, her former husband's name being Gravitt. Mrs. Gravitt had lived in Belton for a number of years prior to her marriage with defendant, and during this time was a member of the Baptist church, and an active and enthusiastic worker in all the fields of labor connected with her church. She formed the acquaintance of Boyd in June 1899, while attending a meeting in the country conducted by Boyd. Subsequent to this time, and prior to Boyd's moving to Belton in December of the same year, she attended other meetings conducted by him, and became associated with him in Sunday-school work and missionary work, and engaged with him in prayer services at her own and her neighbors' houses. After Boyd moved to Belton they became more intimately associated in their church labors, and were together a great deal until a short time before her marriage with Messer. Messer had been upon good terms with Boyd up to and until some three months after his marriage, when, for reasons which will appear hereafter, both he and his wife ceased to speak to

Boyd. On the morning of the homicide, Messer armed himself with a pistol, went to Boyd's house in search of him, and not finding him there, proceeded to the house of one Mr. Woodfin, where he found him. Upon inquiry he was informed that Boyd was there, and requested to see him. Boyd came to the front gate and they engaged in a conversation lasting for some twenty minutes. The gate was seventeen yards from the house. Messer and Boyd then walked across the street and sat down upon some cedar logs, seventeen yards from the gate, and there conversed for fifteen or twenty minutes longer. Mrs. Woodfin, together with her daughter-in-law, Mrs. Katie Woodfin, who were during this time in the front room of the house, with the doors and windows open, saw the parties talking, both at the gate and at the logs, but noticed nothing unusual in the appearance or conduct of either. There were no eyewitnesses to the beginning of the difficulty. The attention of the Mrs. Woodfin was first attracted by the report of a pistol. They did not see this shot fired, nor did they see the parties just prior to the shooting. They both testified that they heard only four shots fired; that after the first shot was fired, they went to the door and window and saw Boyd running in the direction of the house, and Messer following close behind him, shooting at him. Boyd ran into the house, laid down upon the floor, and died in a very short time. Defendant rode back to his house, the distance of a mile, walked from there to the courthouse, the distance of a quarter of a mile, and surrendered to the sheriff. No one heard any of the conversation that took place between the deceased and the defendant at the place of the difficulty. An examination of the clothing and body of the deceased showed that there were three pistol wounds in his body,—two entering the back, one coming out in front, and the other lodging under the skin in front; the third entering the arm from a rear direction, and ranging diagonally from the rear to the front through his coat sleeve, and another with the same range and from the same direction through his coat tail. There were five shots in all fired by the defendant. The theory of the State was that the defendant, on the morning of the killing, deliberately armed himself and went in search of the deceased for the purpose of murdering him; and after talking to him for a half hour or more, coolly and without any provocation whatever murdered him in the public streets of Belton. The defendant contended that he shot and killed the deceased in his own self-defense; that at the time he shot, deceased was endeavoring to arm himself with a rock of sufficient size to inflict upon him serious bodily injuries; and he shot in the apprehension that deceased intended to inflict such injury upon him. He further contended that the deceased at the time and just prior to the shooting, and just prior to the moment he tried to arm himself with the rock, used to him insulting language toward his wife; which language, together with the previous insulting conduct and language used by deceased to his wife, incensed him to such an extent as rendered him incapable of cool reflection, and in the passion thus aroused he shot and killed the deceased. He therefore con-

tended that if he was not justified in apprehending serious bodily harm from the deceased in his effort to secure the rock, and if for that reason he was not wholly blameless for the act, that he was guilty of no higher degree of homicide than manslaughter.

The history of the relations between Mrs. Messer and Boyd and his course of conduct toward her, both prior to and after her marriage with defendant, are given in the testimony of Mrs. Messer substantially as follows, viz: That while she was a widow, and during the summer of 1899, she lived in Belton with her two small children; that she was a member of the Baptist church, and engaged constantly and earnestly in the missionary work and other religious services connected with the church, spending a great deal of her time in these labors; that she first met the deceased, J. D. Boyd, who was a Baptist minister, in June, that the acquaintance ripened into friendship and confidence, and that they were constantly thrown together in church work. That during the month of October, in the same year, Boyd and another preacher named Barker were conducting a meeting at Taylor's Valley, two miles from Belton; she invited both Boyd and Barker to her house to stay all night; that prior to this time Boyd had been accustomed to hold prayer services at her house with her, and at the house of her friend, Mrs. Broaddus, which she regularly attended. That on the night that Boyd and Barker stayed all night at her house, after Barker and all of the members of the family had retired, and as Boyd was in the act of retiring, he said to her: "Well, Sister Gravitt, I suppose I may kiss you good night," and started to put his arm around her; that she jumped back and asked him what he meant; he replied by asking her if the Lord did not instruct them to greet each other with a holy kiss; that she protested, and told him that he knew that such scriptural injunctions were not practiced now, but he insisted that where the brethren and sisters loved each other, there was no harm for them to express their love in that way. That on the next morning he continued his apologies, saying that these were his views of the scriptures, but if she differed with him, he would not force his views on her.

Having accepted his explanation of the matter, and believing he was sincere in his protestation, she continued her social and religious intercourse with him, and was thrown with him constantly in church work and prayer services; that Boyd moved to Belton in December of the same year and was a frequent visitor at her house in the capacity of a minister, and that she was actively engaged with him in all church and missionary and Sunday-school work; that some time in January, 1900, Boyd accompanied her home from a prayer meeting held at the Baptist church, and on the way home he commenced telling her how much he loved her, spoke of his being unhappily married, and suggested that she would be more lenient with him if she understood his circumstances. That after their arrival home Boyd asked her for a drink of water; that she went through the house to the back gallery to get him some water, having to pass through a bed room and dining room and kitchen; that

Boyd followed her, and as she handed him the water on the back gallery he placed it back in the bucket and said to her: "Sister Gravitt, listen to me just a minute. You know that the bible says that if a man looketh on a woman to lust after her, he has committed adultery in his heart; it is no greater crime to sin in the flesh than in the heart; that he had already committed that sin in his heart toward her," and that he put his arm around her and tried to pull up her clothes; that she struggled and got away from him, ran into the house, closed the door, and sank down and cried a long time.

That Boyd visited the house early the next morning, and when he came in she left the house and went to Mrs. Broaddus', across the street; that he followed her, calling to her to stop and asking to speak to her; that he finally overtook her and begged her to say nothing about it. By the time they reached Mrs. Broaddus' gate he said, "What is your word against mine?" That she went in to Mrs. Broaddus' house; he followed her and they had prayer; that after prayer she immediately left and he followed her to Mrs. Broaddus' gate and wanted to go home with her; that she then told him she was going to write to her father and brother in Mexico and ask them for protection, and she forbid him going home with her; that she charged him with trying to rob her of her honor, and refused to have any conversation with him.

That on the same day Boyd came to her house, begged her pardon, and asked her to say nothing about it; she told him that she had written the letter and was going to send it off to her father; he pleaded with her to destroy the letter and forgive him; said he had prayed over it and that God had forgiven him and that he thought she ought to; told her that everyone did not look at matters as she did; that there were plenty of good people around her that did that way and were as highly respected as she; that he had done such things; that he had been accused of things he was innocent of but was guilty of others; he fell on his knees and begged her forgiveness, not on his own account but for the cause's sake; said God seemed to have afflicted him with a weakness in that way; he referred to David and said that he was a man after God's own heart, and to Solomon also, and said God forgave them and that he had forgiven him; he then told her what a scandal it would be for the matter to be made public, and what a blow to the missionary work. He said he would be compelled to protect his own reputation if she said anything about it, by saying that he had seen her intimate with other men; he said so far as the world was concerned reputation and character were the same; that the world would believe his story and not hers. He then fell upon his knees and begged her to forgive him, and promised her that he never would by word or deed mistreat her again. She further testifies that her whole soul was bound up in the church work, and she was willing to suffer herself rather than the cause she was engaged should suffer; and upon his promise made to her, never to mistreat her again, she agreed to say nothing about it, and destroyed the letter she had written to her father. In a day or two afterwards Boyd came back

and told her that as they had been constantly together in their church work, that it would not do for her to discontinue treating him in public as she had before, as it would cause suspicion and attract attention. After talking over this awhile, she agreed to continue to treat him publicly as she had done before, and that he might come to her house to hold prayer meetings if he would bring some one else with him.

Nothing further occurred between the parties until a few days before Mrs. Gravitt's marriage with the defendant, which occurred on March 19, 1900, when Boyd came to her house and inquired if she was to be married to Messer, to which she gave him an affirmative answer. He spoke in the highest terms of both her and Messer, but again expressed his love for her.  She reminded him of his former promise and he desisted.  He then requested her to never mention any part of his past conduct towards her, and she promised that she would not if he never renewed his conduct.

Some time in May following her marriage Boyd made his first visit to defendant's house upon invitation of defendant and Mrs. Messer's sister, to attend a candy-pulling given by the latter.  On this occasion Boyd again renewed his professions of love to Mrs. Messer, whereupon she stopped him and forbid him coming to the house again, and threatened to tell her husband all if he persisted in his cause.

Just after this Mrs. Messer asked her husband who had invited Boyd to the candy-pulling, and he told her that he had done so.  She then requested him not to invite him any more, at which defendant expressed some surprise, saying that he thought she and Boyd were good friends. She gave him some evasive answer.  A few days after this Boyd again visited the house in company with Barker, and according to this witness' testimony, in a few minutes after they arrived Barker suggested prayer and called on Boyd to pray.  She then left the room, and did not return until they were ready to go.  A few days later Boyd came alone to the house but she refused to see him.

During the summer months she saw very little of Boyd, but in the early part of September he passed the house in a buggy and asked her if he could come in, to which she replied that he could not.  Witness testifies that the first information that she gave her husband of Boyd's conduct toward her was on Sunday evening, after Boyd's visit to the house on the occasion of the candy-pulling.  Messer had suggested to her that she take the largest girls and go with them over to the Mission Sunday-school.  She replied that she was thinking of giving up her class.  In this conversation he spoke of Boyd, and the reports about him in the Alligator neighborhood, growing out of some church scandals, saying that it was hard for him to believe the reports to be true, as Boyd seemed to be such a good man.  She told him she believed the reports.  He asked her why.  She told him that Boyd was inclined to be familiar with the ladies of the church, whereupon he asked her if he had ever taken any liberties with her.  She told him that he had; that he had tried to kiss her when she was a widow.  He treated the

matter lightly, and laughed about it, saying that he guessed that he meant no harm. She told him that he did mean harm, that he tried to justify himself by the scriptures and spoke of the holy kiss. Messer said if he took this method of kissing the ladies, then he must be a hypocrite.

From this time on Messer seemed to dislike Boyd, and in a little while ceased to speak to him altogether, as she did also. On the morning after the Galveston storm, which occurred on September 8th, Mrs. Messer told her husband of all of Boyd's misconduct toward her, both before and after the marriage, upon his promise that he would say nothing about it and drop the matter.

From that time on nothing seems to have occurred until the evening before the homicide. Mrs. Messer had·gone in her buggy across the creek to see the washwoman, and as she was returning late in the evening, met Boyd riding horseback on the bridge. He stopped her and asked her if he could have a private interview with her some time when her husband was not at home. She told him no, but if he wanted any private interviews he must have them with her husband. That night when her husband came home she told him of this, and he insisted on going to see Boyd at once, but she finally dissuaded him from going that night. He had an engagement to go to his gin in the country, and told her he would wait till he returned to go to see Boyd. During this conversation she suggested that he take along some good friend of both his and Boyd's when he had the interview. He objected to this, because he said he did not want anybody to know what had occurred and did not want it made public. She then suggested that he take with him John Bassil, who was his brother-in-law, and a leading member in the church. In reply to this he said that he would not mind Bassil knowing what had taken place, if it was necessary. According to this witness' testimony, neither of them slept much that night, and Messer seemed to be troubled. Next morning he prepared to go to his farm, and went by town to get some things which he wanted to carry out.

The defendant testified in his own behalf substantially as did his wife as to what she had told him about Boyd's conduct on the different occasions that she mentioned, and that he believed these statements to be true.

In this connection, the defendant proved by twenty-two witnesses, sixteen of whom resided in the Alligator neighborhood, that deceased (J. D. Boyd's) reputation in that neighborhood for virtue and chastity was bad and had been for three years prior to the trial of this case. The Alligator neighborhood is located on the line of Bell and Williamson counties. The cross-examination of these witnesses developed the fact that this reputation grew out of some church scandals and reports of Boyd's familarity, and indecent proposals to some of the lady members of his congregation while acting as pastor of this church.

The defendant said that he had heard of these reports, and believed them, after his wife had told him of Boyd's conduct towards her. Some

testimony was offered by the State to rebut the proof of Boyd's reputation in this community. But only one of these witnesses was shown to live in this neighborhood, and he was a warm personal friend and champion of Boyd's in the controversy growing out of these scandals. Many of the other witnesses were only able to testify to his reputation at Belton and other places. The defendant's account of what happened on the morning of the killing is substantially this: He had on the night before decided to go to see Boyd and have an understanding with him about his attempts to visit his wife, and his misconduct toward her, but had not intended to go that morning. He went to town to get some money to take to the gin to pay off cotton premiums. Being delayed, and while waiting for the bank to open, he met Broaddus, who was a special friend of Boyd's and had some conversation with him about Boyd with reference to a message he had sent to Boyd, telling him not to speak to him or his wife. In this conversation, Broaddus, among other things, stated to him that Boyd denied any misconduct toward his wife. He then went to see his brother-in-law, John Bassil, and asked him to go with him to see Boyd. Bassil tried to dissuade him from going to see Boyd, but finally consented to go with him. That he then went alone to see Boyd, and on his way met Broaddus again, telling him he was going to see Boyd, and asked him where he could find him. That his purpose in going to see Boyd was to talk to him about the manner in which he had been pursuing his wife and have an understanding with him about the future. He borrowed and carried with him a pistol for protection in event he should need it. The defendant's account of the difficulty is in substance: He said that he found Boyd at the Woodfin residence and asked to see him; that he came out to the gate and offered to shake hands with him, which he refused to do; he told him that he came to talk with him about a matter, and that he (Boyd) knew what it was. Boyd asked him what he had to say about it. He told him that he had borne his insulting conduct towards his wife as long as he could, and he had come to have an understanding with him as to his conduct in the future. Boyd asked him what his wife had been telling him, and he replied that she had told him all that had taken place. Boyd said if his wife thought he had done her any wrong, he was willing to apologize and be friends again. Messer replied that was not what was wanted. He wanted him to quit trying to visit his wife and interview her; quit throwing himself in her way, and did not want him to speak to either of them again; and asked if he was willing to do this. Boyd then asked him if he made this as a demand. He said he did and that this was the last time he expected to speak to him about it. Boyd hesitated and turned away. Messer then said to him: "I guess I will have to go back without an answer, but I want you to listen to what I have to say." He then told him if he ever tried to visit his wife again or speak to her, or throw himself in her way, he would take it as a personal insult, and hold him personally responsible. Messer then started toward his horse, and Boyd stopped him and asked him to go across the street with him

to where there were some cedar logs. Here they sat down, and the conversation was renewed. Boyd here again suggested the matter be dropped, to which the defendant replied that he had already dropped the past, but he did not want him (Boyd) to continue his insulting conduct towards his wife. He then told Boyd what his conduct had been, to which Boyd replied that he (Messer) was trying to get somebody into trouble and trying to scare somebody, and if so, he was trying to scare the wrong man; that he was not afraid of anyone and had been expecting this interview, and would take care of himself; that he and his wife could say what they pleased, but that the public would believe his story before they would theirs; that he had been in trouble of this kind before and had gotten out all right and would do so again. Messer then told him that his demands were reasonable, and asked him if he was going to comply with them; to which Boyd replied: "You are a fool if you think you can make me do anything. I have not hurt your wife much; she was a widow when you married her, and you got all you were entitled to. You know that any Mexican woman will do anything a man wants her to do, and you knew she was a Mexican when you married her." (In this connection, Mrs. Messer's testimony shows that she was born in Mexico, of English parentage, and raised there until she was ten years old.) As Boyd made this last statement, Messer called him a liar and a son of a bitch, and both men rose to their feet at the same time. Boyd sprang for a rock about the size of his fist and Messer drew his pistol and began shooting. Boyd ran in the direction of the house. Messer did not know whether he had hit Boyd or not, nor how many times he had shot; but proceeded to his home, about a mile away, and from there to the courthouse, about a quarter of a mile, at which place he surrendered to the officers. Messer's passions were so aroused by the conduct and language of Boyd, that, to use his own expression, they was indescribable.

The matters pertaining to the impeachment of Mrs. Messer (the wife) as a witness, and the charges of the court which were complained of, are so fully stated in the opinion as to supersede the necessity of any further statement.

*George W. Tyler, James E. Ferguson, J. B. McMahon,* and *Banks & Cochran,* for appellant, filed a most able brief and argument which the Reporter regrets can not, on account of its length, be reproduced.

*Winburne Pierce, W. W. Hair,* District Attorney, and *Rob't A. John,* Assistant Attorney-General, for the State, also filed an able brief and motion for rehearing.

BROOKS, Judge.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a period of twenty years.

The testimony adduced on the trial shows, substantially, that defend-

ant had been informed by his wife that deceased had offered numerous indignities to her prior to her marriage with him, and several insults after her marriage; that upon being apprised of these insults, by the wife, appellant sought deceased, as he stated, with the view of getting deceased to desist from any further attentions towards his wife; that upon meeting deceased, whom he was seeking, and after a conversation continuing some twenty or thirty minutes, deceased offered additional insults to appellant's wife, and attempted to secure a rock with which to assault appellant, and thereupon appellant proceeded to shoot deceased, and pursued him as he ran off, firing five shots into his body, from which wounds he died. Appellant's wife testified to the insults above referred to, and the State introduced testimony for the purpose of contradicting and impeaching the truthfulness of her statement.

The first assignment of error that we deem necessary to be considered is appellant's insistence that the court erred in permitting the State to prove by Mrs. M. B. Broaddus a conversation between her and the appellant's wife, which took place in the spring of 1900, about the month of March, after the marriage of defendant with his wife, in which conversation Mrs. Broaddus was allowed to testify as to various matters then stated. Appellant's objection to this testimony is that the conversation testified by Mrs. Broaddus was not admissible for the purpose of contradicting the wife of appellant, but that same was separate and independent matter, whereby appellant's wife was made to give testimony against herself through the mouth of Mrs. Broaddus. Appellant concedes, in the able brief and argument of his counsel, that this testimony is admissible for this purpose; that is, for the purpose of contradicting and showing the lack of truth in Mrs. Messer's testimony. But the testimony of Mrs. Broaddus shows she testified to facts that would not be admissible in impeachment of appellant's wife. The law does not permit the husband or wife to be witnesses against each other. If the husband is on trial, and his wife is a witness, and she should swear to facts injurious to him in answer to questions he propounds, he can not complain. But, where she swears to certain facts and circumstances, the cross-examination must be confined to the matter elicited in chief. Of course, everything legitimate for the purpose of testing her knowledge of the facts testified to, her bias, her prejudice, in fact any matter that legitimately goes to her discredit, is admissible on cross-examination. However, where the State leaves the matter testified to in chief, and proves independent criminative facts against the accused, this would not be a proper cross-examination of the witness. Jones v. State, 38 Texas Crim. Rep., 100-118; Gaines v. State, 38 Texas Crim. Rep., 228; Red v. State, 39 Texas Crim. Rep., 423; Merritt v. State, 39 Texas Crim. Rep., 79; Creamer v. State, 35 Texas, 174; Hoover v. State, 35 Texas Crim. Rep., 344.

Applying the foregoing rule to the testimony of Mrs. Broaddus, while it is too voluminous to review each item of her testimony, we will say it was not permissible for the State to prove by her the conversation

she had with the wife of appellant, wherein the wife detailed a long train of domestic infelicities and entreated on her part to persuade appellant to join the ministry. The testimony of Mrs. Broaddus should be confined within the rule above laid down, under the predicate laid for the impeachment and contradiction of the testimony of appellant's wife. Only this, and nothing more, should be permitted. We merely state the foregoing as an illustration of the inadmissibility of a large part of Mrs. Broaddus' testimony. In other words, the wife of appellant having testified to direct insults by deceased to her prior to and subsequent to her marriage to appellant, if she made any statement or statements to Mrs. Broaddus or other parties contradictory of the statements testified, upon a proper predicate being laid, she could be impeached by the introduction of the witnesses testifying to the contradiction. But it is never permissible to permit such witnesses to go further and prove more than these contradictions. Appellant complains of the following portion of the court's charge: "The evidence of the witnesses Hyde, Barker, Mrs. Broaddus, Mrs. Wood, and Mrs. Boyd, tending to contradict the evidence of Mrs. Messer, the wife of defendant, was introduced solely as going to the credibility of said Mrs. Messer as a witness, and not as any evidence of the guilt of the defendant, and you can consider it only for the purpose for which it was introduced and for no other purpose." Appellant insists this charge is upon the weight of the evidence. We think the charge is correct. The court also charged the jury: "In this connection you are further charged, that where a homicide committed by a husband is sought to be reduced to manslaughter by reason of insulting conduct towards the wife of the slayer, while the insulting conduct towards such female before her marriage could not be relied upon to reduce such homicide to manslaughter, yet such conduct, if known to the husband, may be looked to for the purpose of giving character to the conduct of the person killed towards such female after her marriage, and in illustrating the intent and acts and words of the person killed as they appeared to such husband at the time of the homicide." This is a correct presentation of the law as far as this charge goes. But appellant insists that the court should have gone further and made an application of the law to the facts. In Jones v. State we said: "If, in this case, appellant believed the insulting conduct communicated by his wife actually occurred as detailed by her, then, to his mind such conduct was a reality, and the charge should have been so framed as to submit this immediate issue to the jury. Men often act upon the most important affairs and interests in life upon mistakes of fact. They often risk honor, reputation, fortune, and life upon mistakes of fact; of course, believing at the time they are not mistaken. The guilt of the accused party, in such state of case, should not depend upon the existence or non existence of the fact itself, but upon the circumstances as they appeared to and were understood by him at the time of his acting upon them. Such questions are matters of fact to be solved by the jury under appropriate instructions. That the

insulting conduct had or had not occurred would have been immaterial if she had so informed Jones, and he believed her. If the jury should believe that Mrs. Jones informed her husband of the conduct of deceased towards her, and that his passions were thereby aroused to the extent of rendering his mind incapable of cool reflection, and that, while his mind was thus inflamed, he shot and killed Veal upon first meeting with him after receiving such information, his offense would be of no higher grade than manslaughter." Jones v. State, 33 Texas Crim. Rep., 497. This phase of the law was not given in this case. The court, in addition to the charge above indicated, should have told the jury, that although they may believe the wife's testimony about insults on the part of deceased is not true, yet the jury should take such real or supposed insults into consideration in passing upon the guilt or innocence of appellant; and if they find from the evidence that defendant believed the statements of his wife, and the statements of his wife, coupled with the statements and acts of the deceased at the time of the homicide, taken together, rendered defendant's mind incapable of cool reflection, and while laboring under such anger, rage, sudden resentment or terror, produced from said previous insults repeated to him by his wife, together with the insults and acts of the deceased at the time of the homicide, he slew deceased, then and in that event he would be guilty of manslaughter; and as to whether defendant believed the statement of his wife in reference to the insults offered by deceased is a question that must be passed upon from defendant's standpoint. The State, through its special counsel, insists that: "If defendant claims he killed deceased because of certain language or conduct, which is not itself adequate cause, the jury can look to the former conduct of deceased believed by defendant, for the purpose of understanding the meaning of the language and conduct of deceased at the time of the homicide, and if, construed in this light, the language at the time of the homicide becomes adequate cause, and if the other essentials are present, then the offense is manslaughter; but if the language claimed to have been used by the deceased is of itself adequate cause, and such that the former conduct and language believed to have been used by him does not explain or throw any light upon it, then it becomes unnecessary for the jury to look to that former conduct and language." We know of no authority supporting this position. Simply because deceased may have offered an insult to defendant at the time of the homicide sufficient to have produced an adequate cause, and thereby reduce the homicide to manslaughter, would not justify the court in refusing to charge on the law indicated above. If the previous insults and indignities, coupled with the present indignities, as contended by appellant, could be and ought to be considered, then surely previous insults, coupled with the present adequate cause, being a double reason, should be considered by the jury in passing upon the issue of manslaughter.

Appellant further insists that the court erred in the following portion of the charge: "If from the evidence you believe that defendant

killed the said Boyd, and further believe that, at the time of so doing, deceased made an attack on him which, from the manner and character of it, and the relative strength of the parties, and defendant's knowledge of the character and disposition of the deceased, caused him to have reasonable expectation or fear of death,   *   *   *   then you will acquit." The particular part complained of is, "and defendant's knowledge of the character and disposition of the deceased," in that the same was a charge upon the weight of the evidence. This charge is correct. Clearly, the character of the deceased being known to appellant, as the evidence in this case shows, it was proper for the court to charge the jury as it did.

Appellant's seventh assignment of error is that the court erred in excluding the testimony of the witness Mart Land, offered by defendant, to the effect that in a conversation with deceased, Boyd, during the fall of 1899, and shortly before the time Mrs. Messer testified that Boyd began his misconduct towards her, Boyd asked the witness "how he liked his little widow" (referring to Mrs. Gravitt, who subsequently became the wife of appellant), and, upon being reprimanded, replied that the witness knew his weakness along that line. This testimony should have been admitted, as it tends to corroborate the testimony of appellant's wife as to the conduct of deceased towards her.          ,

Appellant's eight assignment of error is that the court erred in refusing to permit defendant to prove by Mrs. J. D. Bassill that during the summer of 1900, and after the time that Mrs. Messer testified she told defendant about Boyd (deceased) attempting to kiss her while she was a widow, in a conversation between defendant and witness Mrs. Bassill, defendant related to her the circumstances his wife had previously told him about. Appellant insists this testimony is admissible for the reason that the State had attacked the testimony of Mrs. Messer and appellant upon this subject as false and fabricated, and that the testimony of said witness would have corroborated and strengthened the testimony of appellant and his wife. In Utzman v. State, 32 Texas Criminal Reports, 428, defendant offered to prove by his elder half-brother that defendant talked to witness about the insults offered by deceased to his wife soon after appellant moved from deceased's place to Hamilton County, stating to witness that he had just learned these facts from his wife, and that while appellant was talking to witness he became very much agitated and shed tears; and we held said testimony as admissible. In Jones v. State, 38 Texas Criminal Reports, 102, we held that conversations defendant and his wife had with the witness Kendall with reference to a similar matter were admissible. See also Hammond v. State, 28 Texas Crim. App., 413; Craig v. State, 30 Texas Crim. App., 619. We think this testimony was admissible as tending to rebut the contention of the State that the defense urged by appellant was fabricated. It was also admissible as tending to show that insults had been communicated to appellant by his wife.

The question as to the disqualification of the jury, urged and ably insisted upon by appellant, we do not deem necessary to be reviewed, as it will not likely arise upon another trial of this case. For the errors discussed, the judgment is reversed, and the cause remanded.

*Reversed and remanded.*

[Note.—The State's motion for rehearing was overruled without a written opinion.—Reporter.]