## W. E. TAYLOR v. THE STATE.

### No. 3052.    Decided April 15, 1914.

### Rehearing denied May 13, 1914.

### Judgment reformed May 27, 1914.

**1.—Murder—Evidence—Husband and Wife—Cross-examination.**

Where, upon trial of murder, the defendant sought to reduce the offense, if any, to manslaughter and introduced his wife who testified to insulting conduct by the deceased towards her and that she so informed her husband who killed the deceased the next morning, and also testified to other recent insults by the deceased which she had not communicated to her husband, there was no error, on cross-examination, to ask her why she did not tell him of the other claimed insults, as this affected her credibility and was legitimate cross-examination. Davidson, Judge, dissenting.

**2.—Same—Rule Stated—Cross-examination—Husband and Wife.**

Whenever a husband or wife is put upon the witness stand to testify in behalf of the other, he or she so testifying should be subjected to as rigid a cross-examination like any other witness, with the exception only that he or she could not be examined in regard to anything against the other about which there had been no testimony on the examination in chief. Following Creamer v. State, 34 Texas, 173, and other cases.

**3.—Same—Rule Stated—Husband and Wife—Impeachment.**

It is equally as well settled that the wife can be impeached like any other witness, and as was done in the instant case. Following Shelton v. State, 34 Texas, 663, and other cases. Overruling Marsh v. State, 54 Texas Crim. Rep., 144.

**4.—Same—Evidence—Husband and Wife—Impeaching Testimony—Case Stated.**

Where, upon trial of murder, the wife of the defendant testified as to insulting conduct by deceased towards her on the evening before the killing, and defendant claimed this insulting conduct by the deceased towards defendant's wife to reduce the offense to manslaughter, there was no error in permitting the State on cross-examination to ask her whether she did not tell her minister shortly after the killing that she did not know why her husband did the killing, which she denied, and thereupon permit the State to place said minister on the witness stand who testified that she did so tell him. Following Swanney v. State, 66 Texas Crim. Rep., 293, and other cases. Davidson, Judge, dissenting.

**5.—Same—Reforming Sentence—Indeterminate Sentence.**

Where, upon appeal from a conviction of murder assessing life imprisonment in the penitentiary, it appeared to this court that the punishment of defendant should be assessed at the indeterminate time of not less than five years nor more than for a lifetime, the sentence is accordingly reformed.

Appeal from the District Court of Burleson. Tried below the Hon. Ed. R. Sinks.

Appeal from a conviction of murder; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*T. J. Carter* and *Hair & Woodward,* for appellant.—On question of cross-examination of wife: Marsh v. State, 54 Texas Crim. Rep., 144; Yeiral v. State, 56 Texas Crim. Rep., 267, 119 S. W. Rep., 848; Ballard v. State, 71 Texas Crim. Rep., 587, 160 S. W. Rep., 716, and cases cited in opinion.

*C. E. Lane,* Assistant Attorney General, for the State.—On question of cross-examination of wife: Branch Crim. Law., sec. 853; Cameron v. State, recently decided.

DAVIDSON, Judge.—Appellant was convicted of murder, his punishment being assessed at life imprisonment in the penitentiary.

The facts show that appellant was in the employ of the deceased, Silliman; that he and his wife and children were boarding at Silliman's residence, as were several other parties who testified in the case as witnesses. Silliman was a lumber dealer and contractor. Appellant was a carpenter, and was employed by Silliman in building a railroad depot. There came friction between appellant and family on one side and Silliman and family on the other, with reference to Silliman's children. This had occurred two or three times, and the last occasion a day or so before the homicide. On the morning of the homicide Silliman went to appellant's room and told him he must leave his place. In other words, he must secure another boarding place and do it at once. Appellant informed him that he would do so when his month was out. The conversation was emphasized with decided feeling as indicated by the testimony. There is some conflict in the evidence as to what occurred at this conversation. Appellant's contention was, and his testimony is to the effect, that Silliman said they would settle it outside, going from where the conversation occurred out to his front yard. Appellant upon Silliman leaving got his pistol and put it about his person and went out in the yard where Silliman was and notified him of his arrival. Appellant's theory of what occurred was that deceased called him a son-of-a-bitch and emphasized the language in which the term was used, and appellant shot twice, one of the shots taking fatal effect. The witnesses differ as to whether the term "son-of-a-bitch" was used by the deceased. That was one of the conflicts of the testimony. There is some evidence

also to the effect that at some previous date Silliman had suspended or stopped the work of appellant for a short time·but reinstated him.  To use the expression of one of the witnesses, Silliman "laid him off."  This matter seems, however, to have been bridged and appellant went back to work again.  It is also in evidence that appellant had chastised one of Silliman's children on two different occasions.  That this seems to have been done with Silliman's consent, and there is some evidence showing that Silliman himself told appellant that he would whip his child and perhaps did do so.  Appellant's wife was introduced and testified at considerable length about the matters and things occurring with reference to the children and all the matters that took place while they were boarding at Silliman's residence.  She also testified that on several occasions he, deceased, undertook to take liberties with her person, and finally the evening prior to the homicide the next morning he renewed his advances to take liberties with her person.  She left him hurriedly and rushed into the room where her husband was.  He noticed her excited condition and demanded the occasion of her trouble.  She declined to tell him and did not do so until that night after they had retired.  She testified that this excited her husband very much, and that he was like a crazy man.  Appellant and his wife went to breakfast the next morning; they both ate very sparingly, and in fact they testified substantially they ate nothing.  Then the matters previously mentioned, wherein Silliman ordered appellant to leave the place, occurred.  This is a sufficient statement of the case to bring in review two or three matters urged for reversal.

A bill of exceptions recites that after the State had closed its testimony in chief, and after the defendant had placed on the stand as witnesses, R. G. Clayton and F. O. Kelley, at which time no testimony had been introduced by the State or the defendant as to any alleged insults having been given the wife of the defendant by the deceased, and up to which time no testimony had been introduced touching any conversation between the wife of the defendant and the Rev. M. C. Bishop, that immediately after the testimony of these witnesses his wife was placed upon the stand, and her testimony is given in detail, covering several pages of the bill of exception.  In her testimony she narrates the insulting conduct of the deceased, none of which she informed her husband, however, except as to what occurred the evening before the homicide.  After all this testimony on direct examination, the State then took her on cross-examination, and all this occurred, the bill narrates, before the defendant had himself taken the stand as a witness.  While she was testifying on cross-examination, one of the prosecuting counsel asked her whether or not she had telephoned for the Rev. M. C. Bishop, a Baptist minister, soon after the killing to come and see her.  She answered this in the affirmative.  The bill narrates:  "I will ask you to state if it is not a fact that as soon as he came into your room where you were, if he did not say to you, 'Mrs. Taylor, this is.awful.  Isn't this awful?' and you said, 'It certainly is, and I don't know why my husband killed Mr. Silli-

man.' " Appellant urged various and sundry objections to this testimony as to its materiality, and a collateral matter, and an inquiry about a subject which was not inquired about on the examination by counsel for the defense, and the witness was the wife of the defendant on trial, and that it is a matter, if it did occur, which involved hearsay as to what some other party said, and because such an answer would be an expression of an opinion of a witness. The court overruled all these objections, and the inquiry proceeded. Her answer was: "I don't remember whether I said those words or not." And the court permitted, over the same objections of the defendant, the State to ask and required the witness to answer certain other questions in reference to the same subject matter, which is as follows: "Those are the words I want to ask you about. You can state one way or the other if you did not tell the Baptist minister in substance those words? A. I remember saying to him, 'It certainly is,' when he asked why Mr. Taylor did it I could not tell him why. Q. Did you not tell him that you did not know what the cause was or why? A. No, sir, I don't remember that I said anything of the kind. I don't remember what I said. Q. Will you say that you did or did not say that? A. I don't remember. I do not think that I used those words. I was so excited myself. Q. You would not say one way or the other about it? A. No, sir. Q. The Baptist preacher is named Bishop? A. Yes, sir." The objections were again urged and overruled. The court qualifies this bill as follows: "The witness had in the first of her cross-examination stated that she did say to Mr. Bishop, the Baptist preacher, that she had no idea why her husband killed Silliman. She had further stated that she did know that defendant killed deceased because he had insulted her. This testimony was without objection." The bill of exceptions and this qualification are at variance, and the bill of exceptions seems to be taken from the stenographic report.

Another bill recites that before the defendant had testified in his own behalf and after the wife of the defendant had testified as follows: and then sets out her testimony again as in the previous bill, covering quite a number of pages, and which bill of exceptions recites that this was all of her testimony upon direct examination, as does this bill, and after the said witness was turned over to the State for cross-examination, and after she had testified in answer to questions by the State that she had told her husband about the insults that night after they had retired, and after she had testified that she did not tell him that night about but one insult, the State asked her why she did not tell him about the others, and she replied, "Because I didn't do it," and she was asked, "Can you give any reason why you did not?" She replied, "I thought once was enough." "You thought once was enough?" "I thought it was." The State then propounded the following questions: "When did you tell your husband about the other two insults? A. I did not tell him about the other two." Then the following question was asked by the State: "You never told your husband until you told it now upon the stand, you never told your husband about the other two until you told it in his

presence now?" A great number of objections were urged to this, among others, that all this occurred while appellant was in jail from the time of the shooting until the present time; that the witness is the wife of the defendant, and that this question is about a matter which was not inquired about by the defense on her examination in chief, and not germane to anything asked witness during her examination in chief; that it involves and concerns what occurred between the husband and wife after the husband was arrested, and that the same is forcing the wife to become a witness against the husband without his consent." All of this was overruled by the court, and the witness answered, "No, sir." The bill then further recites that the court permitted, over the same objections, the following questions and answers of the witness by the State: "You are sure about that? A. I have not had a chance to talk to my husband but very little. Q. You have talked with him? A. Very little since I came back to Caldwell. Q. You have talked with him several times? A. Yes, but I say I have not talked with him very much. Q. It would not take very long to tell him that? A. Why should I tell him, once was enough. Q. When did you tell these gentlemen (indicating counsel for defense) about these insults? A. I think I have not talked with Mr. Hair very much, have not talked to him very much. Q. The question is, when did you tell Mr. Carter and Mr. Hair about these insults? A. I told them about the insults. I don't remember when it was. Q. About when was it? A. I don't even know when that was. When were you here? Q. I want you to testify about when? A. I don't know. Q. About when? A. About three weeks ago I think it was, was it not? I don't know. I don't remember. Q. You told Mr. Carter about three weeks ago about one insult? A. Yes, sir. Q. You never did tell either of them about the other two insults until you took the stand tonight? A. Yes, sir." A great many objections were urged, among others, that it was privileged communications and could not be inquired into by the State, and same had not been inquired about on the direct examination in chief, and was not germane thereto, and the court overruled each and all of these objections. This bill is signed without qualification.

Another bill recites that after Clayton and Kelley had testified for the defendant, and no testimony had been introduced by the State or defendant as to any alleged insults having been given the wife of the defendant by the deceased, and up to which time no testimony had been introduced touching any conversation between the wife of the defendant and the Rev. M. C. Bishop, then follows the testimony of Mrs. Taylor, wife of the defendant, covering several pages and same as in the previous bills of exception, and the bill recites that was all the testimony she gave upon her direct examination. Then the bill further recites that after the witness, Ida Taylor, wife of defendant, was turned over to the State for cross-examination, and before the defendant had testified in his own behalf upon the trial of this cause, one of State's counsel asked her whether or not she had telephoned for Rev. M. C. Bishop, a Baptist

minister, soon after the killing to come and see her, which she answered in the affirmative. Then the following matters occurred: "I will ask you to state if it is not a fact that as soon as he came into your room where you were, if he did not say to you, 'Mrs. Taylor, this is awful. Isn't this awful?' and you said, 'It certainly is, and I don't know why my husband killed Mr. Silliman." Various objections were urged to this, covering a half page of the transcript. They were all overruled, and witness answered: "I don't remember whether I said those words or not." And the court permitted, over the same objections of the defendant, the State to ask and required the witness to answer certain other questions in reference to the same matter, which questions and answers are as follows:

"Q. Those are the words I want to ask you about. You can state one way or the other if you did not tell the Baptist minister in substance those words? A. I remember saying to him, 'It certainly is,' when he asked why Mr. Taylor did it I could not tell him why. Q. Did you not tell him that you did not know what the cause was nor why. A. No, sir, I don't remember that I said anything of the kind. I do not remember what I said. Q. Will you say that you did or did not say that? A. I don't remember. I do not think that I used those words. I was so excited myself. Q. You would not say one way or the other about it? A. No, sir. Q. The Baptist preacher is named Bishop? A. Yes, sir." Here the objections were again urged and overruled, and the bill recites: "Be it remembered that thereafter, during the progress of the same trial, the State placed on the stand the Rev. M. C. Bishop in rebuttal, who, after being duly sworn by the clerk of the court, was asked by the State the following questions: Q. What is your name? A. M. C. Bishop. Q. You are the Baptist minister here at Caldwell. A. I am. Q. The morning that Mr. Silliman was killed by Mr. Taylor, were you called by Mrs. Taylor, wife of defendant, to her residence— to the Silliman residence—to see her? A. I was. Q. Did you go? A. I did. Q. When you went to that residence did you meet her? A. I did. Q. In her room? A. Yes, sir." All of this occurred in the presence of the jury and all of which answers went to the jury. The State then asked the following question of said witness: "I will ask you if you said to her, 'Mrs. Taylor, this is awful,' and she said, 'Yes, it certainly is, and I don't know why he did it or the cause or reason for doing it?'" Quite a number of objections, and practically the same as those set forth heretofore, were urged and overruled, and the questioning proceeded: "Q. You heard the question, what is your reply? A. That conversation took place. Q. Just like I have stated it to you? A. Yes, sir." Then follows the urging of the objections again. This bill is qualified by the court as follows: "In the first part of the witness' cross-examination she stated without objection that she had made the statement to M. C. Bishop. Later on in the cross-examination she denied doing so as above set out, which was objected to as above set out, and I then allowed this testimony as above set out. The witness had also

testified in her cross-examination that defendant killed the deceased because he had insulted her."

We are of the opinion that these matters were erroneous. The wife had testified to several insults, only one of which she had communicated to her husband. Any legitimate inquiry about this matter would be proper, inasmuch as the defendant had proved before the jury that his wife had communicated to him the last insulting conduct. Of course, the other occasions of insulting conduct would not affect the defendant as he had not been apprised of it. The matters occurring between the wife and her husband and counsel would be of such a nature under the conditions and circumstances of this case as would not permit the cross-examination of the wife with reference to the matters occurring between them and herself, though her husband was in jail from the time of the homicide or a few moments afterward, until the trial, and any matters that occur between her husband and herself and conversations would be privileged under the statute, and the communications between herself and her husband and counsel in reference to the preparation of the trial or matters of that sort would be also privileged.

With reference to the conversation had between herself and Bishop, it was of such a nature as was not germane, in our opinion, to her testimony that she had communicated to her husband the fact of the insult the evening prior to the killing. Counsel had not asked her as to any conversation between herself and Bishop, or what occurred between them. This was new matter brought out by the State, and could not be brought in as evidence from the wife against the defendant, nor was it the subject of a cross-examination of the wife. This direct question, it occurs to us, was decided adversely to the State in Marsh v. State, 54 Texas Crim. Rep., 144, at pages 147 and 148. The conversation between defendant's wife and Bishop forms no part of the transaction inquired of from appellant's wife in her original examination. It related to another matter altogether, and was, therefore, not receivable either for the purpose of impeachment or as a circumstance to be weighed against appellant on her testimony; and it may be further stated in this connection, as in the March case, it involved, in our judgment, the opinion of the witness as to the killing. See Richards v. State, 53 Texas Crim. Rep., 400; Jones v. State, 38 Texas Crim. Rep., 87; Messer v. State, 63 S. W. Rep., 643; Washington v. State, 17 Texas Crim. App., 197; Hoover v. State, 35 Texas Crim. Rep., 342; Gaines v. State, 38 Texas Crim. Rep., 202; Creamer v. State, 34 Texas, 173; Greenwood v. State, 35 Texas, 587; Merritt v. State, 39 Texas Crim. Rep., 70; Johnson v. State, 28 Texas Crim. App., 17; Hamilton v. State, 36 Texas Crim. Rep., 372; Owen v. State, 7 Texas Crim. App., 329; Red v. State, 39 Texas Crim. Rep., 414; Bluman v. State, 33 Texas Crim. Rep., 43; 70 Am. St. Rep., 719; Yeiral v. State, 56 Texas Crim. Rep., 267; Stewart v. State, 52 Texas Crim. Rep., 273; Ballard v. State, 71 Texas Crim. Rep., 587, 160 S. W. Rep., 716; Hobbs v. State, 53 Texas Crim. Rep., 71; Hickey v. State, 62 Texas Crim. Rep., 568, 138 S. W. Rep., 1051;

Branch's Crim. Law, secs. 852-853, 867. Under these authorities we are of the opinion that this cross-examination was too latitudinous and involved matters that were not germane to the witness' direct examination. Being the wife of the appellant, the statute, limiting the cross-examination of the wife, prohibited, we think, the State from going into matters discussed.

The judgment ought to be reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, Presiding Judge, and HARPER, Judge (dissenting).—We think the testimony admissible, and the case should be affirmed, and it is so ordered. Johnson v. State, 28 Texas Crim. App., 17; Jones v. State, 38 Texas Crim. Rep., 87; Gaines v. State, 38 Texas Crim. Rep., 202; Merritt v. State, 39 Texas Crim. Rep., 70.

## ON REHEARING.

### May 13, 1914.

PRENDERGAST, Presiding Judge.—In order to correctly understand the questions decided in this case, we will briefly state the case and the issues. Appellant was convicted for the murder of W. B. Silliman on August 14, 1913, and his punishment assessed at life imprisonment.

Appellant and his wife were boarding and had a room at Mr. Silliman's for some short time prior to the homicide. They had no children. Silliman and his wife had several small children. From time to time while appellant and his wife were boarding and rooming at Silliman's, appellant abused, struck and whipped some of Silliman's children. He thus abused and struck one or two of them late in the evening or early night, prior to the homicide the next morning just after breakfast. Silliman was informed of the mistreatment of his children. He had put up with it before, every time it occurred. The next morning just before the killing, he ordered appellant to leave his house. Appellant declined to do so, stating he would not until the end of the month. The evidence indicates that deceased then said to him to come out in the yard and they would settle it. Deceased went on out in the yard and was standing talking to some friends smoking a cigarette which he was holding between the fingers of his left hand. He was in his shirt sleeves and wholly unarmed. Appellant went in his room, armed himself with a big six-shooter, secreted it in his clothes about his person and walked out to where deceased was standing talking to others. Appellant was smoking his pipe. He walked up to where deceased was and said, "I am here now, what do you want?" or "what will you have?" The witnesses differ as to what Silliman then said. There were several eyewitnesses present who heard and saw everything that was then said and done. Several of these witnesses said that Silliman replied that he wanted him to get out of his house, and said nothing more to him. Appellant and two of his witnesses said that Silliman's reply to him was, "Well, I want you

to move out of my house, you damned old son-of-a-bitch." The only difference between the witnesses on this point was whether Silliman said "you damned old son-of-a-bitch." All of the witnesses, including appellant himself, say that Silliman made no threat, made no motion of any kind to assault, or do appellant any kind of injury. Appellant then pulled his big six-shooter and at once shot at the deceased, evidently missing him. He then removed his pipe from the center of his mouth to one side thereof, deliberately stepped back three or four steps, raised his left arm, rested the six-shooter thereon, deliberately aimed and fired at the deceased, the ball striking him in the left arm, thence through it into the body, and through his heart, killing him instantly. This was in front of Silliman's house a few steps from his front gallery. Several eyewitnesses who testified were on this gallery or standing at or near deceased when he was killed. Appellant at once walked back on the gallery and his wife came to him. She and he both testified she said to him, "Why did you do it?" and each testified that he replied, "Because I had to." Several other witnesses who were present, most of them disinterested, said he replied, "Because I wanted to."

Appellant had an examining trial soon after the killing. He testified at the time. His testimony was reduced to writing and signed by him. This was proven up and the defendant himself introduced it on this trial. It is shown thereby that the first thing he testified was: "Of course, I will have to go back and establish a motive, if a motive there be, for this killing." Then he tells of the trouble with deceased's children and his whipping or striking them from time to time and what occurred thereabouts the night before the killing and that the deceased because thereof the next morning ordered him to leave, etc. He further testified, "I killed Mr. Silliman because he called me a God damn son-of-a-bitch, and that is the sole reason I killed him." He denied making this statement on this trial, or at least attempted to do so, but in addition to his written signed testimony, which he produced and introduced himself, the State introduced several other witnesses who swore positively that appellant, on the examining trial, swore exactly as quoted above. By his whole testimony at that time there was no intimation that he killed deceased because deceased had insulted his wife.

On this trial appellant sought to reduce the offense, if any, to manslaughter. He introduced his wife and had her testify that the evening before the killing deceased insulted her, caught hold of her, attempted to pull, or did pull her into his, deceased's, room; in effect, proposing or attempting to induce her to permit him to have sexual intercourse with her; that she told appellant of this that night and that that was the cause of appellant killing the deceased. He testified that she told him of this insult to her by deceased that night and that was the reason he killed deceased the next morning. She also testified on this trial that deceased had recently twice before insulted her with the same intent and for the same purpose, but that she had not told her husband of either of those insults and had told him only of the one she claimed occurred the

night before; that she had told no one else,—not even the appellant's attorneys, nor until she testified on the stand at this time. That she swore she *did not* tell her husband, in no possible way was requiring her to divulge any confidential communication, but the very reverse of this.

It will thus be seen that appellant, for the first time, on the trial of this cause claimed, and he and his wife testified, that he killed deceased because of this alleged insult by deceased to her the night before. The State contended that her said testimony was false and undertook to show the falsity thereof by showing and proving by her on cross-examination that she had not told her husband of either of the two previous claimed insults by deceased to her, and to impeach her by showing that at once after the killing she called Mr. Bishop, the Baptist minister, over the 'phone, to come to see her and he did so in response to her request, and saw her in her room upon his arrival. She said when the Baptist minister came in her room, he shook hands with her, and said to her, "Mrs. Taylor, this is awful." She admitted that she replied to him, "Yes, it certainly is," but denied she then said to him, "I don't know why he did it, or the cause or reason for doing it." In impeachment of her the court permitted Mr. Bishop, the Baptist minister, to testify that she did say to him at the time as quoted just above.

The sole question in this case is whether or not the State, under the circumstances, should have been permitted to cross-examine Mrs. Taylor and have her testify that she told appellant at no time of either of the first two claimed insults by deceased to her, for the purpose of tending to show, and showing, that her testimony to the effect that deceased had insulted her the night before and she had told appellant was untrue, and that, as a matter of fact, deceased had never at any time insulted her and she at no time had told her husband he had. And whether the State could impeach her by the Baptist minister as was done.

Our statute on the subject is:

Article 794, Code Criminal Procedure: "Neither husband nor wife shall in any case testify as to the communication made by one to the other while married. . . ." (The latter part of this article does not apply, as this case was not an accusation against appellant of any offense upon her person.)

Article 795, Code Criminal Procedure: "The husband and wife may, in all criminal actions, be witnesses for each other; but they shall, in no case, testify against each other, except in criminal prosecution for an offense committed by one against the other."

These articles have been in our Code at least since 1856. They have many times been construed and applied by the decisions of this court and the Supreme Court, while it had criminal jurisdiction. By both courts it has always been held that when the husband who is on trial introduces his wife to testify in his behalf and she does so that she is subject to cross-examination just like any other witness, save and except that new incriminating evidence can not be brought out against

the accused by her; and that she can be impeached in the same way and to the same extent as any other witness can be.

In one of the first cases where these statutes were construed it was contended by an accused that the wife could not be thus cross-examined and that she could not be impeached, the Supreme Court, in Creamer v. State, 34 Texas, 173, said:

"We are unwilling to believe that the Legislature intended recklessly to strike a fatal blow at the very foundation of all judicial investigation and truth, and at the same time to open a wide door to mistakes, errors, fraud and perjury. The principal if not the only object of a cross-examination is to test the truth of the evidence given on the examination in chief; not to elicit new facts, but to criticise and weigh those which have already been given; to sift the *truth* from error, prejudice and ignorance, and to present to the court and jury only that which is .the true measure of justice and equity. Greenleaf says that the object of a cross-examination 'is to fully investigate and ascertain the situation of the witness with respect to the parties and to the subject of litigation, his interest, his motive, his inclination, and prejudices, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony, the manner in which he has used those means, his powers of discernment, memory, and description, and submit them to the consideration of the jury before whom he has testified, who have thus an opportunity of observing his demeanor, and determining the just weight and value of his testimony.' (1 Greenleaf, 446, 449; see also 1 Starkie Ev., 129.) We are unable to see how a cross-examination of the wife, properly understood, could be construed into testimony against her husband, and more especially if the wife has testified in her examination in chief to nothing but the truth. And if she has testified falsely, then truth, justice and the law demand that she should be exposed, regardless of the consequences. We are therefore of the opinion that whenever a husband or wife is upon the witness stand to testify in behalf of the other, he or she so testifying should be subjected to as rigid a cross-examination as any other witness, with the exception only that he or she could not be examined in regard to anything against the other about which there had been no testimony on the examination in chief. This we believe is the true intent and meaning of the statute, and the only one that can reconcile the law with the principles of truth and justice."

This decision has many times been cited and approved by this court and our Supreme Court. There can be no question but that it announces the correct doctrine and proper construction of said statute. It is as equally well settled that the wife can be impeached as any other witness and as was done in this case, by a long line of decisions of this court and of the Supreme Court. On both these points we cite only some of them,—not all by any means. Shelton v. State, 34 Texas, 663; Hampton v. State, 45 Texas, 154; Swanney v. State, 66 Texas Crim. Rep., 293, 146 S. W. Rep., 548; Dobbs v. State, 54 Texas Crim. Rep., 550; Exon v. State, 33 Texas Crim. Rep., 461; Buchanan v. State, 41 Texas

Crim. Rep., 127; Brown v. State, 61 Texas Crim. Rep., 334; Reagan v. State, 70 Texas Crim. Rep., 498, 157 S. W. Rep., 483; Smith v. State, 44 S. W. Rep., 520; Crews v. State, 34 Texas Crim. Rep., 533; Young v. State, 54 Texas Crim. Rep., 417; Red v. State, 39 Texas Crim. Rep., 414; Johnson v. State, 162 S. W. Rep., 512; Cameron v. State, 69 Texas Crim. Rep., 439, 153 S. W. Rep., 867; Ward v. State, 70 Texas Crim. Rep., 393, 159 S. W. Rep., 272; Northcutt v. State, 70 Texas Crim. Rep., 577, 158 S. W. Rep., 1004; Perry v. State, 153 S. W. Rep., 138; Link v. State, 164 S. W. Rep., 993; Johnson v. State, 28 Texas Crim. App., 17; Jones v. State, 38 Texas Crim. Rep., 87; Gaines v. State, 38 Texas Crim. Rep., 202; Merritt v. State, 39 Texas Crim. Rep., 70. It is unnecessary to discuss the questions, or point out the special holding in each case. They each specifically hold the cross-examination was correct, and evidence is admissible.

We have cited some of the same cases that Judge Davidson cites in his original opinion herein in the latter part thereof. None of the cases cited by him, when properly understood and properly applied, are in conflict with what we hold herein and the cases we have cited above, save and except one of them.

That case, in conflict herewith, is Marsh v. State, 54 Texas Crim. Rep., 144. In view of the long and uniform holding of this court to the contrary of that decision it must be that the court in that case misapprehended the question, otherwise a decision holding as it does on this question would not have been rendered; but whatever was the cause thereof, it is hereby expressly overruled where it is in conflict with what we hold herein and the decisions we have cited above.

There can be no question as we see it but under the statute and the decisions the court committed no error in the matters complained of shown by appellant's bills to the cross-examination of, nor introduction of the testimony contradicting and impeaching appellant's wife. The motion is overruled.

*Overruled.*

DAVIDSON, Judge (dissenting).—I can not agree with my brethren in affirming this case. The testimony as to what occurred between the Baptist minister, Bishop, and the *wife* of appellant subsequent to the homicide in appellant's absence is not admissible against him either as original evidence or impeaching testimony.

First. It was res inter alias acta.

Second. These were declarations of the *wife against her husband.*

Third. No part of the conversation between the minister, Bishop, and appellant's wife was brought out on her direct examination by her husband, and was no part of her testimony nor of any fact brought out by him on her direct examination.

Fourth. It could not be used as *original evidence against her husband by the State.* This is not debatable, for it would have been making

her a witness for the State against her husband in direct contravention of the statute. See White's Ann. C. C. P., arts. 774-775.

Fifth. These declarations could not be used to *impeach appellant's wife* under the rule laid down in the Drake case, 29 Texas Crim. App., 265. The Drake case has been followed in all subsequent decisions. I refer to Hickey v. State, 62 Texas Crim. Rep., 568. See, also, Saunders v. Railroad, 99 Tenn., 130, 41 S. W. Rep., 1034.

Sixth. The State could not have used the testimony in making out its case as original evidence. White's Ann. C. C. P., arts., 774-775, and for collation of cases, see the same work, sec. 986; Drake v. State, 29 Texas Crim. App., 265; Hickey v. State, 62 Texas Crim. Rep., 568; Marsh v. State, 54 Texas Crim. Rep., 144. My brethren found it necessary, in order to affirm this case, to overrule the Marsh case. The opinion in that case was written by Judge Ramsey, and is a clear enunciation of the law and ought not to be overruled; but this case could not be affirmed in the face of the opinion in the Marsh case. In this connection, she was the wife of appellant, and her testimony could not be used against him.

Seventh. I can not agree to the statement by my brethren that the wife is subject to the same rule as the ordinary witness as to cross-examination. This states the rule entirely too broadly, and is in direct contravention of the plain working of the statute in several respects. There is to be observed under the plain statutory language a wide difference between the attitude of ordinary witnesses in a case to the accused and that sustained by his wife towards him when she is used as a witness. To hold otherwise would abrogate the statute and render it a nullity. This was so at common law. The rule has been intensified and broadened under the statute of Texas. The *difference between the wife as a witness in her husband's* case and that of the *ordinary witness* in the same case is so widely different and so distinctly marked that it takes no discussion to understand the difference. To hold that the wife occupied the same relation to her husband's case when used as a witness as an ordinary witness would be to sap the very foundation of the law of the State. It is well recognized that *confidential communications between the accused and other parties are not privileged, but between the husband and the wife it is privileged*. This is by statute. It is enacted that the wife may not be used against the husband except in cases of violence by the husband upon herself. This rule does not apply to other witnesses. It is so thoroughly well settled that the wife can not be interrogated in matters other than those brought out by her husband on her examination that it is useless to refer to the authorities. This is not true as to other witnesses.

For the reasons indicated I can not agree to the affirmance of the case, and most respectfuly enter this as a summary of my dissenting views.

REFORMING SENTENCE.

May 27, 1914.

PRENDERGAST, PRESIDING JUDGE.—In this case the verdict of the jury found the appellant guilty of murder and assessed his punishment at confinement in the penitentiary for life. The sentence, based on this, fixed the punishment specifically at life imprisonment instead of an indeterminate sentence as required by the Act of August 18, 1913, p. 4. In some way this escaped our attention when the case was affirmed and the motion for rehearing overruled. The sentence will, therefore, be reformed by this court so that, in accordance with the said Act of August 18, 1913, the punishment of appellant will be assessed at the indeterminate time of not less than five years nor more than for his lifetime. The sentence is, therefore, reformed in accordance with said Act, and the clerk of this court is directed to enter the proper sentence in accordance with this opinion and said law, and certify the same properly to the court below.

*Reformed.*